IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:11-CV-1-D

| | |
|---|---|
| TOWN OF NAGS HEAD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| MATTHEW A. TOLOCZKO, | ) |
| and LYNN B. TOLOCZKO, | ) |
| | ) |
| Defendants. | ) |

At its core, this case involves whether the Town of Nags Head ("Town" or "plaintiff") can enforce land-use ordinances against the owners of a private home abutting the ocean beach. The case raises profound and unresolved issues of North Carolina law that transcend this particular case. As the Fourth Circuit has recognized on several occasions, it is not the role of a federal court to intervene in such delicate state-law matters. Accordingly, and as explained in detail below, the court dismisses without prejudice defendants' counterclaims for equitable or declaratory relief, abstains from hearing defendants' other counterclaims and the Town's claim for damages and stays those claims and counterclaims, and dismisses certain claims and counterclaims that are moot or unripe.

I.

Matthew A. Toloczko and Lynn B. Toloczko (collectively "Toloczkos" or "defendants") own an oceanfront cottage ("Cottage") located at 199 East Seagull Drive, Nags Head, North Carolina. Countercl. [D.E. 7] ¶¶ 3, 7. Over the years, natural forces have gradually eroded the beach that once separated defendants' Cottage from the Atlantic Ocean. See Pl.'s Resp. Defs.' Mot. Summ. J. [D.E. 30] 2–3. On November 12, 2009, a powerful storm struck the Town. Countercl. ¶¶ 30–32. This storm damaged the Cottage and washed away a significant amount of

surrounding sand, including the sand around the Cottage's septic tank. Id. ¶¶ 32–33.

On November 14, 2009, the Town sent the town manager to inspect defendants' Cottage. Am. Compl. [D.E. 1-3] ¶ 5. Based on the damage observed during this inspection, the Town condemned the Cottage. Id. ¶¶ 4–6; Countercl. ¶ 37. On November 30, 2009, the Town issued a declaration of nuisance ("Nuisance Declaration"), an order of abatement, and a warning citation to defendants. Am. Compl. ¶ 8; id. Ex. A; Countercl. ¶ 38; id. Ex. A. The Nuisance Declaration informed defendants that the Cottage created a "likelihood of personal and property injury" and was located in the "public trust," in violation of Town Ordinance § 16-31(6)(b) and (c) ("Ordinance 16-31(6)"). Am. Compl. Ex. A; Countercl. Ex. A.[1] The Town instructed defendants to demolish the Cottage within eighteen days or face daily $100 fines. Am. Compl. ¶¶ 9, 10; id. Ex. A; Countercl. ¶¶ 40, 42; id. Ex. A. The Town also warned defendants that it would take action to demolish the Cottage if defendants refused to do so themselves. Am. Compl. Ex. A; Countercl. ¶ 40; id. Ex. A. On January 15, 2010, the Town issued defendants a civil citation for failure to comply with the Nuisance Declaration and began assessing daily $100 civil penalties. Am. Compl. ¶ 15; id. Ex. B; Countercl. Ex. B.

---

[1] Ordinance 16-31(6) provides:

Storm or erosion damaged structures and resulting debris. The existence of any of the following conditions associated with storm-damaged or erosion-damaged structures or their resultant debris shall constitute a public nuisance.

(a) Damaged structure in danger of collapsing;

(b) Damaged structure or debris from damaged structures where it can reasonably be determined that there is a likelihood of personal or property injury;

(c) Any structure, regardless of condition, or any debris from damaged structure which is located in whole or in part in a public trust area or public land.

Nags Head, N.C., Code § 16-31(6).

On July 7, 2010, the Town adopted Ordinance No. 10-07-021 ("Ordinance 10-07-021"), which amended various sections of the Town's Code of Ordinances. Countercl. ¶ 63; Nags Head, N.C., Ordinance No. 10-07-021 (July 7, 2010).[2] In essence, Ordinance 10-07-021 requires owners of properties located within the "public trust beach area" to obtain building permits before undertaking any construction-related work on their properties. See Ordinance No. 10-07-021. It also prohibits the issuance of building permits for structures that have been declared public nuisances pursuant to Ordinance 16-31(6). Id.

On December 6, 2010, the Town filed suit in the Dare County, North Carolina Superior Court ("Dare County Superior Court"), requesting an expedited hearing and seeking an order of abatement for the Cottage and recovery of the civil penalties that it had assessed against defendants [D.E. 1-2]. The Town amended its complaint on January 6, 2011 [D.E. 1-3]. The Town now asserts three claims:

(1) An order of abatement pursuant to N.C. Gen. Stat. § 160A-175. Am. Compl. ¶ B.

(2) In the alternative, an order of abatement pursuant to N.C. Gen. Stat. § 160A-193. Id. ¶ C.

(3) Recovery of civil penalties pursuant to N.C. Gen. Stat. § 160A-175. Id. ¶ D.

On January 7, 2011, defendants removed the case to this court based on diversity of citizenship [D.E. 1]. On January 21, 2011, defendants filed an answer and asserted twenty-one

---

[2] Ordinance 10-07-021 is available at http://216.92.112.133/departments/administration/Board-ordinances/index-ordinances.htm (last visited Mar. 28, 2012) (available under the heading "Public trust land permitting"). The ordinance contains four amendments to the Town's Code of Ordinances. The first amendment defines the term "public trust beach area." See Nags Head, N.C., Code § 48-7. The second classifies as "prohibited" any structure that existed in the public trust beach area and states that a Nuisance Declaration issued pursuant to Ordinance 16-31(6)(c) is sufficient, but not necessary, to "prohibit" a structure. See id. § 48-87(c). In addition, any construction or maintenance work (but not demolition work) on prohibited structures now requires building permits. See id. The third amendment adds similar building restrictions to another section of the Town's Code. See id. § 48-123. The fourth bans the issuance of building permits for any structure subject to a Nuisance Declaration. See id. § 16-33(c).

3

counterclaims against the Town [D.E. 7]:

(1) Declaratory judgment that the Cottage is not in the "[p]ublic [t]rust" area. Countercl. ¶¶ 106–14.

(2) Declaratory judgment that the Town's enactment of Ordinance 16-31(6)(c) exceeded the Town's state statutory authority. Id. ¶¶ 115–22.

(3) Declaratory judgment that the Town's ordering defendants to demolish the Cottage violated N.C. Gen. Stat. §§ 160A-441 to -540. Id. ¶¶ 123–30.

(4) Declaratory judgment that the Cottage is "not likely to cause personal or property injury." Id. ¶¶ 131–37.

(5) Declaratory judgment that the Town lacks the authority to declare structures on the "dry sand beach" nuisances. Id. ¶¶ 138–53.

(6) Declaratory judgment that Ordinance 16-31(6)(c) does not authorize the Town to declare as nuisances structures located on the "dry sand beach." Id. ¶¶ 154–62.

(7) Declaratory judgment that N.C. Gen. Stat. § 143-138 preempts Ordinance 10-07-021. Id. ¶¶ 163–78.

(8) Declaratory judgment that the Town's enactment of Ordinance 10-07-021 exceeded the Town's zoning authority. Id. ¶¶ 179–91.

(9) Declaratory judgment that the Town's enactment of Ordinance 10-07-021 exceeded the Town's nuisance authority. Id. ¶¶ 192–209.

(10) Declaratory judgment that Ordinance 10-07-021 unlawfully delegates the Town's zoning power to the town manager. Id. ¶¶ 210–21.

(11) Declaratory judgment that the Cottage is not subject to Ordinance 10-07-021. Id. ¶¶ 222–31.

(12) Declaratory judgment that the Town's enactment of Ordinance 10-07-021 violated defendants' vested rights to the application of the Town's unamended ordinances. Id. ¶¶ 232–52.

(13) Declaratory judgment that the Town's actions deprived defendants of their substantive due process rights as provided by the United States and North Carolina Constitutions. Id. ¶¶ 253–56.

(14) Declaratory judgment that the Town's actions deprived defendants of their procedural due process rights as provided by the United States and North Carolina Constitutions. Id. ¶¶ 257–60.

(15) Declaratory judgment that the Town's actions deprived defendants of equal protection under the law as provided by the United States and North Carolina Constitutions. Id. ¶¶ 261–68.

4

(16) The Town acted under color of state law to deprive defendants of their rights secured by the Fifth and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. § 1983. Id. ¶¶ 269–73.

(17) Preliminary and permanent injunctions against the Town's demolishing the Cottage. Id. ¶¶ 274–82.

(18) The Town's actions were a regulatory taking under the United States and North Carolina Constitutions. Id. ¶¶ 283–92.

(19) Initiation of an inverse condemnation proceeding against the Town. Id. ¶¶ 293–306.

(20) The Town slandered defendants' property title. Id. ¶¶ 307–15.

(21) The Town was negligent in determining that the Cottage violated Ordinance 16-31(6). Id. ¶¶ 316–21.

On February 25, 2011, the Town filed an answer to defendants' counterclaims [D.E. 12, 15]. On March 8, 2011, the Town moved to dismiss two of defendants' counterclaims (counterclaims three and twenty-one) and filed a supporting memorandum [D.E. 17, 19]. On March 22, 2011, defendants responded [D.E. 20].

On June 14, 2011, defendants moved for partial summary judgment, arguing that they were entitled to judgment as a matter of law as to all of the Town's claims and five of defendants' counterclaims (counterclaims one through five) [D.E. 25, 26]. The Town responded in opposition on July 25, 2011 [D.E. 30], and defendants replied on July 27, 2011 [D.E. 31].

On September 19, 2011, defendants asked the court to hold a status hearing [D.E. 32], to which the Town did not object [D.E. 34]. The Town and defendants informed the court that a beach nourishment project had restored the beach sand in front of the Cottage and, as a result, the Town had withdrawn the Nuisance Declaration on September 14, 2011. See Defs.' Mot. Status Conf. [D.E. 32] Ex. A; Pl.'s Resp. Defs.' Mot. Status Conf. [D.E. 34] 1–2. Specifically, the Town notified defendants that the Cottage "no longer constitutes a violation of Town Code Sec. 16-31(6)(b) & (c)," and the Town invited defendants to apply for permits to repair any damage to the Cottage. Defs.' Mot. Status Conf. Ex. A. The Town explained that even though the Cottage was

5

"clearly still" in the public trust area, the Town had lifted the Nuisance Declaration because the Cottage no longer impeded "use of and access to the ocean beach." Id.

On November 7, 2011, defendants moved for partial summary judgment as to fourteen of their counterclaims (counterclaims six through sixteen and eighteen through twenty) [D.E. 37, 38–43]. On December 9, 2011, the Town responded in opposition [D.E. 46]. On December 23, 2011, defendants replied [D.E. 47].

On February 23, 2012, defendants supplemented their summary judgment motions by notifying the court of Town of Nags Head v. Cherry, Inc., ___ N.C. App. ___, 2012 WL 540742 (2012) [D.E. 48]. Relying on Cherry, defendants also requested leave to file a motion to dismiss the Town's claims [D.E. 49]. The Town responded in opposition [D.E. 50], and defendants replied [D.E. 51]. On March 23, 2012, the Town filed a motion for leave to file a motion for summary judgment [D.E. 53].

II.

Because this case involves diverse parties, the court has subject-matter jurisdiction over the claims and counterclaims. 28 U.S.C. § 1332. Initially, however, the court addresses whether it should exercise its jurisdiction.

A.

Federal courts may decline to exercise jurisdiction in "exceptional circumstances." Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 716 (1996) (quotation omitted); see New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI), 491 U.S. 350, 358–59 (1989); Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 813–14 (1976); Martin v. Stewart, 499 F.3d 360, 363 (4th Cir. 2007). The abstention doctrine recognizes "that a federal court has the authority to decline to exercise jurisdiction when it is asked to employ its historic powers as a court of equity." Quackenbush, 517 U.S. at 717 (quotation omitted). Despite the doctrine's equity-based roots, "the authority of a federal court to abstain from exercising its jurisdiction extends to

6

all cases in which the court has discretion to grant or deny relief." Quackenbush, 517 U.S. at 718; see NOPSI, 491 U.S. at 359. Thus, the abstention doctrine permits federal courts to decline to exercise jurisdiction over declaratory judgment actions. Quackenbush, 517 U.S. at 718; see, e.g., Samuels v. Mackell, 401 U.S. 66, 69–70 (1971); Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 297 (1943). In addition, federal courts may abstain from exercising jurisdiction over actions "at law" by postponing federal adjudication of a dispute. Quackenbush, 517 U.S. at 719–20; Johnson v. Collins Entm't Co., Inc., 199 F.3d 710, 727–28 (4th Cir. 1999).

Abstention "remains the exception, not the rule." NOPSI, 491 U.S. at 359; see Colo. River, 424 U.S. at 813. A federal court may abstain only "when principles of federalism and comity outweigh the federal interest in deciding a case." Martin, 499 F.3d at 363 (quotation omitted); see Quackenbush, 517 U.S. at 716. Moreover, "[t]he Supreme Court has never allowed abstention to be a license for free-form ad hoc judicial balancing of the totality of state and federal interests in a case. The Court has instead defined specific doctrines that apply in particular classes of cases." Martin, 499 F.3d at 364 (emphasis omitted); see NOPSI, 491 U.S. at 359. Although the court has identified specific classes of cases warranting abstention, these classes "are not rigid pigeonholes into which federal courts must try to fit cases." Pennzoil Co. v. Texaco Inc., 481 U.S. 1, 11 n.9 (1987); see Martin, 499 F.3d at 364; Johnson, 199 F.3d at 728. "Rather, they reflect a complex of considerations designed to soften the tensions inherent in a system that contemplates parallel judicial processes." Pennzoil, 481 U.S. at 11 n.9; see Johnson, 199 F.3d at 728.

The abstention doctrine announced in Burford v. Sun Oil Co., 319 U.S. 315 (1943), is particularly relevant here. In Burford, an oil company challenged a state agency's order regulating oil and gas permitting. Id. at 316–19. The oil company sought to enjoin the order's enforcement and, based on diversity of citizenship and an alleged denial of federal rights, brought its claims in federal court. Id. at 317. The district court abstained, and the Supreme Court affirmed. Id. at 334. The Court noted that oil and gas exploration raised important and complex state issues, causing

7

the state to enact an elaborate regulatory and appellate scheme for oil and gas exploration permitting. See id. 318–24. Because a federal decision interpreting that scheme could create conflicting precedents and generate confusion in a well-regulated area of great state importance, the Court held that "equitable discretion should be exercised." Id. at 327–32. Subsequently, the Court made clear that Burford requires a federal court to abstain when adjudication would unduly intrude upon a complex state regulatory scheme because a case raises difficult and important questions of state law that transcend the case or because federal adjudication would disrupt a state's coherent public policy. See Quackenbush, 517 U.S. at 725–27; NOPSI, 491 U.S. at 361; Colo. River, 424 U.S. at 814–16; Martin, 499 F.3d at 364; Johnson, 199 F.3d at 719; Pomponio v. Fauquier Cnty. Bd. of Supervisors, 21 F.3d 1319, 1325 (4th Cir. 1994) (en banc), overruled on other grounds by Quackenbush, 517 U.S. at 730–31. Notably, Burford abstention is appropriate when a federal court's ruling would interfere with "complex state administrative procedures." Great Am. Ins. Co. v. Gross, 468 F.3d 199, 206 n.5 (4th Cir. 2006); Chase Brexton Health Servs., Inc. v. Maryland, 411 F.3d 457, 462 n.1 (4th Cir. 2005); see Martin, 499 F.3d at 364; see also NOPSI, 491 U.S. at 361; Pomponio, 21 F.3d at 1325.

Louisiana Power & Light Co. v. City of Thibodaux, 360 U.S. 25 (1959), is also noteworthy. In Thibodaux, a Louisiana municipality exercised its eminent domain power to expropriate a Florida-based power company's land, buildings, and equipment. Id. at 25. The power company removed the case to federal court based on diversity of citizenship. Id. However, the district court stayed the action to allow the Louisiana Supreme Court to interpret the state statute at issue. Id. at 26, 30. The United States Supreme Court affirmed the district court's decision to abstain. Id. at 30–31. The Court stated that "the justification for [a court's abstention] power . . . lies in regard for the respective competence of the state and federal courts systems and for the maintenance of harmonious federal–state relations in a matter close to the political interests of a State." Id. at 29. Not only was eminent domain "intimately involved with sovereign prerogative," but determining

8

the bounds of a municipality's eminent domain power would have required intrusion into the "apportionment of governmental powers between City and State." Id. at 28. The Court noted that no Louisiana court, in a similar context, had interpreted the statute at issue. Id. at 30. Rather than forcing the district court to "make a dubious and tentative forecast" of state law, the prudent course was to delay the federal proceedings until Louisiana courts had spoken to the issue. Id. at 29–30. The Court held that the "hazards of serious disruption by federal courts of state government" and the "needless friction between state and federal authorities" justified the district court's decision to abstain. Id. at 28. Thibodaux thus established grounds for abstention "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar." Colo. River, 424 U.S. at 814; Country Vintner of N.C., LLC v. E & J Gallo Winery, Inc., No. 10-2289, 2012 WL 29166, at *2 (4th Cir. Jan. 6, 2012) (unpublished) (quotation omitted); see Neufeld v. City of Balt., 964 F.2d 347, 349 (4th Cir. 1992); see also Quackenbush, 517 U.S. at 717 ("[F]ederal courts have the power to refrain from hearing cases . . . raising issues intimately involved with the State's sovereign prerogative, the proper adjudication of which might be impaired by unsettled questions of state law . . . ." (quotation and alterations omitted)); Gross, 468 F.3d at 206 n.5; Chase Brexton, 411 F.3d at 462 n.1.

Despite their factual differences, Burford and Thibodaux support abstention based on the danger of federal interference with unsettled, important policy matters reserved to the states. Colo. River, 424 U.S. at 814.[3] As the Court discussed in Thibodaux, challenges to municipal regulation

---

[3] The Court has indicated that Burford and Thibodaux give rise to a single abstention doctrine. See Colo. River, 424 U.S. at 814–16 & n.21 (grouping the two cases' abstention rules within the same "general categor[y]" of abstention); see also NOPSI, 491 U.S. at 361 (articulating a single "Burford doctrine" based on the Colorado River Court's unified description of Burford and Thibodaux). The Fourth Circuit treats Burford and Thibodaux as articulating two distinct abstention rationales. See, e.g., Country Vintner, 2012 WL 29166, at *2; Gross, 468 F.3d at 206 n.5; Chase Brexton, 411 F.3d at 462 n.1; Pomponio, 21 F.3d at 1325.

9

of local property are rife with difficult and important state-law questions that transcend a particular case. See 360 U.S. at 28–30. Although the presence of a municipal land-use issue does not alone warrant abstention, see Cnty. of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 191–92 (1959); Neufeld, 964 F.2d at 350–51, the Fourth Circuit has repeatedly counseled district courts to avoid interference with a municipality's land-use regulation authority. See Pomponio, 21 F.3d at 1328; Front Royal & Warren Cnty. Indus. Park Corp. v. Town of Front Royal, Va., 945 F.2d 760, 765 (4th Cir. 1991); Beacon Hill Farm Assocs. II Ltd. P'ship v. Loudoun Cnty. Bd. of Supervisors, 875 F.2d 1081, 1085 n.6 (4th Cir. 1989); Meredith v. Talbot Cnty., Md., 828 F.2d 228, 231–32 (4th Cir. 1987); Browning-Ferris, Inc. v. Balt. Cnty., Md., 774 F.2d 77, 79 (4th Cir. 1985); Caleb Stowe Assocs., Ltd. v. Albemarle Cnty., Va., 724 F.2d 1079, 1080 (4th Cir. 1984); Nature Conservancy v. Machipongo Club, Inc., 579 F.2d 873, 875–76 (4th Cir. 1978) (per curiam); Fralin & Waldron, Inc. v. City of Martinsville, Va., 493 F.2d 481, 482–83 (4th Cir. 1974).[4] Accordingly, the Fourth Circuit has approved abstaining from deciding municipal land-use questions based on Burford, see, e.g., Pomponio, 21 F.3d at 1328; Front Royal, 945 F.2d at 763; Meredith, 828 F.2d at 232; Browning-Ferris, 774 F.2d at 79–80, and Thibodaux, see, e.g., Caleb Stowe, 724 F.2d at 1080; Machipongo, 579 F.2d at 873; Fralin & Waldron, 493 F.2d at 483. In Pomponio, the Fourth Circuit declared that "[i]n cases in which plaintiffs' federal claims stem solely from construction of state or local land[-]use or zoning law . . . the district courts should abstain under the Burford doctrine to avoid interference with the State's or locality's land[-]use policy." 21 F.3d at 1328.

Regardless of which abstention doctrine a court cites in a land-use case, the central theme is the same—land use is an important public policy that lies within the prerogative of a sovereign state, see Pomponio, 21 F.3d at 1327 ("We can conceive of few matters of public concern more

---

[4] The court has located only one land-use case in which the Fourth Circuit held that abstention was inappropriate. See Neufeld, 964 F.2d at 350–51. In Neufeld, the court held that the land-use issues were straightforward under state law and merely "peripheral" to the preemption question at the case's heart. See id.

10

substantial than zoning and land[-]use laws."); Meredith, 828 F.2d at 232; Browning-Ferris, 774 F.2d at 79; Caleb Stowe, 724 F.2d at 1080; Machipongo, 579 F.2d at 876; Fralin & Waldron, 493 F.2d at 483, and state courts have expertise in handling this public policy issue. See Front Royal, 945 F.2d at 765; Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482. In other words, especially where the legal issues are important and unresolved, "state and local zoning and land[-]use law is particularly the province of the State and . . . federal courts should be wary of intervening in that area in the ordinary case." Pomponio, 21 F.3d at 1327.

These abstention doctrines apply to cases, such as this one, that arise under the court's diversity jurisdiction. See, e.g., Burford, 319 U.S. at 317–18; Thibodaux, 360 U.S. at 25; Machipongo, 579 F.2d at 875. Furthermore, the court can abstain sua sponte. E.g., Front Royal, 945 F.2d at 763; Caleb Stowe, 724 F.2d at 1080.

## B.

Fifteen of defendants' counterclaims seek declaratory relief. The Declaratory Judgment Act allows a court, "[i]n a case of actual controversy within its jurisdiction . . . [, to] declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Declaratory Judgment Act is an enabling provision, conferring on courts discretion to grant declaratory relief; it does not confer "an absolute right upon [a] litigant." Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) (quotation omitted). "[D]istrict courts have great latitude in determining whether to assert jurisdiction over declaratory judgment actions." United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 493 (4th Cir. 1998) (quotation omitted); Aetna Cas. & Sur. Co. v. Ind-Com Elec. Co., 139 F.3d 419, 422 (4th Cir. 1998) (per curiam).

However, this discretion is not unbridled. See, e.g., Kapiloff, 155 F.3d at 493; Ind-Com, 139 F.3d at 422. When deciding whether to render a declaratory judgment, a court should determine whether the controversy is better suited for state-court resolution. See, e.g., Ind-Com,

11

139 F.3d at 422–23; Chapman v. Clarendon Nat'l Ins. Co., 299 F. Supp. 2d 559, 563 (E.D. Va. 2004); Aetna Cas. & Sur. Co. v. Alpha Mech., Inc., 9 F. Supp. 2d 585, 586–89 (W.D.N.C. 1998); cf. Wilton, 515 U.S. at 282; Kapiloff, 155 F.3d at 493–94. The court should consider:

> (i) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts; (ii) whether the issues raised in the federal action can more efficiently be resolved in [state court]; (iii) whether permitting the federal action to go forward would result in unnecessary entanglement between the federal and state court systems, because of the presence of overlapping issues of fact or law; and (iv) whether the declaratory judgment action is being used merely as a device for procedural fencing.

Am. Nat'l Prop. & Cas. Co. v. Skiles, 5 F. App'x 206, 208 (4th Cir. 2001) (per curiam) (unpublished) (quotations and alterations omitted); see Kapiloff, 155 F.3d at 493–94; Ind-Com, 139 F.3d at 422. In essence, the court should base its analysis on federalism, efficiency, and comity concerns. See, e.g., Ind-Com, 139 F.3d at 422–23; Alpha Mech., 9 F. Supp. 2d at 587 & n.5. Moreover, before abstaining, the court need not find that each enumerated factor has been satisfied. See Kapiloff, 155 F.3d at 494 (district court did not abuse its discretion when there was a "set of mixed indicators").

A federal court should not grant declaratory relief when doing so would cause the court "to break new ground or [face] novel issues of state interest." Kapiloff, 155 F.3d at 494; see also Ind-Com, 139 F.3d at 424; Mitcheson v. Harris, 955 F.2d 235, 236, 238, 240 (4th Cir. 1992); Am. Motorists v. Commonwealth Med. Liab. Ins., 306 F. Supp. 2d 576, 581 (E.D. Va. 2004); Chapman, 299 F. Supp. 2d at 563–64; Alpha Mech., 9 F. Supp. 2d at 588. "In other words, in declaratory actions Congress has afforded the federal courts a freedom not present in ordinary diversity suits to consider the state interest in having state courts determine questions of state law." Mitcheson, 955 F.2d at 238. Moreover, as a federal district court in North Carolina, this court lacks authority to certify questions of North Carolina law to the Supreme Court of North Carolina. See In re McCormick, 669 F.3d 177, 182 n* (4th Cir. 2012).

III.

In light of these principles, the court considers whether to exercise jurisdiction over defendants' counterclaims and the Town's claims.

A.

Defendants' first six counterclaims seek declarations that Ordinance 16-31(6)(c) is either invalid or inapplicable to defendants' Cottage. The court declines to exercise jurisdiction over these counterclaims based both on abstention principles and the discretionary nature of the court's declaratory judgment power.

Here, defendants contest a local land-use regulation's application. Although Ordinance 16-31(6)(c) may not be a traditional zoning law, the ordinance is nonetheless a land-use regulation. In general, nuisance laws are closely related to zoning laws. See 83 Am. Jur. 2d Zoning & Planning § 1 (2012); 101A C.J.S. Zoning & Land Planning § 1 (2011). The significant difference between the two is their respective objectives: nuisance laws seek to prevent one owner's land use from interfering with another owner's land use. See 66 C.J.S. Nuisances § 1 (2011). Zoning laws, on the other hand, promote a community's "health, safety, morals, and general welfare." See 83 Am. Jur. 2d Zoning & Planning § 1 (2012). Despite having different objectives, zoning and nuisance laws have the same effect—they regulate land use. Compare 83 Am. Jur. 2d Zoning & Planning § 1 (2012) (zoning decisions control individual and community land use), and 101A C.J.S. Zoning & Land Planning § 1 (2011) (zoning is the regulation of land use), with Phila. Elec. Co. v. Hercules, Inc., 762 F.2d 303, 314 & n.10 (3d Cir. 1985) ("[T]he goal of nuisance law is to achieve efficient and equitable solutions to problems created by discordant land uses." (emphasis removed)), 58 Am. Jur. 2d Nuisances § 151 (2012) (the law of nuisance entails a balancing of competing land uses), and 66 C.J.S. Nuisances § 1 (2011) (same). Thus, a public nuisance ordinance is classifiable as a land-use regulation. See Cleveland Housing Renewal Project v. Deutsche Bank Trust Co., 621 F.3d 554, 566–68 (6th Cir. 2010) (finding public nuisance ordinance

13

to be a land-use regulation, but holding that Burford abstention was inappropriate because district court's ruling would not disrupt state's uniform policy); cf. Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1028–32 (1992) (a landowner is not entitled to compensation when a government enacts a "confiscatory regulation" that "do[es] no more than duplicate the result that could have been achieved . . . by adjacent landowners . . . under the State's law of private nuisance . . . ."). Ordinance 16-31(6)(c), which essentially prohibits landowners from using property in a way that obstructs the ocean beach, is a land-use regulation. Despite its "nuisance" caption, the ordinance promotes the public's safety and general welfare by ensuring unobstructed use of the ocean beaches.

Defendants' counterclaims ask the court to construe a municipal land-use regulation. Defendants seek a declaratory judgment that the Cottage is not in the "public trust area," see Countercl. ¶¶ 106–14, and argue that the "public trust area" does not include the "dry sand beach," see id. ¶¶ 154–62. To rule on these counterclaims, the court would need to determine the definition of the term "public trust area," as used in Ordinance 16-31(6)(c). Thus, defendants ask the court to interpret a municipal land-use regulation. See Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482–83. Moreover, the court would have little state-law guidance to assist it in doing so. See Burford, 319 U.S. at 331; Johnson, 199 F.3d at 721; Machipongo, 579 F.2d at 87.[5]

---

[5] The court would have to rely on a hodgepodge of tangential and conflicting sources in construing the ordinance. For instance, according to statute, "public trust rights" include "the right to freely use and enjoy the State's ocean and estuarine beaches . . . ." N.C. Gen. Stat. § 1-45.1. In addition, citizens have public trust rights in the "ocean beaches," N.C. Gen. Stat. § 77-20(d), and "ocean beaches" include the "dry sand area . . . that is subject to occasional flooding by tides . . . ." Id. § 77-20(e). Thus, public trust rights arguably include at least a portion of the dry sand area.

However, in Cooper v. United States, 779 F. Supp. 833 (E.D.N.C. 1991), the court noted that "[t]he extent to which the public trust doctrine applies to dry sand in North Carolina is an unsettled question." Id. at 835; cf. Concerned Citizens of Brunswick Cnty. Taxpayers Ass'n v. State ex rel. Rhodes, 329 N.C. 37, 55, 404 S.E.2d 677, 688 (1991) ("We note dicta in the Court of Appeals opinion to the effect that the public trust doctrine will not secure public access to a public beach across the land of a private property owner. As the statement was not necessary to the Court of

14

Defendants also challenge the Town's authority to enact Ordinance 16-31(6)(c) and to enforce the ordinance against the Cottage. See Countercl. ¶¶ 115–22, 123–30, 138–53. Defendants do not question North Carolina's authority to abate a nuisance such as the Cottage; instead, defendants contend that the state legislature has not delegated this power to the Town. See id.[6] Defendants' request is strikingly similar to the one made by the power company in Thibodaux, which required the district court to determine the "apportionment of [eminent domain] powers

---

Appeals opinion, nor is it clear that in its unqualified form the statement reflects the law of this state, we expressly disavow this comment." (citation omitted)). Thus, "in the absence of a clear precedent[,]" the Cooper court held that the public trust doctrine did not apply to a privately owned dry sand area. 779 F. Supp. at 835; cf. West v. Slick, 313 N.C. 33, 60–62, 326 S.E.2d 601, 617–18 (1985) (recognizing the "long standing right of the public to pass over and along" wet sand area).

Further complicating the matter, the North Carolina Constitution declares that "it shall be a proper function of the State of North Carolina and its political subdivisions . . . to preserve as a part of the common heritage of this State its . . . beaches . . . and places of beauty." N.C. Const. art. XIV, § 5. Yet, it is unclear whether, in preserving "beaches," the state should preserve only wet sand, or wet and dry sand.

Finally, even if the court were able to determine the boundaries of the "public trust rights," it is unclear whether the term "public trust area," as used in Ordinance 16-31(6)(c), is synonymous with the "public trust rights" referred to in section 77-20, or whether "public trust area" in the ordinance means something else.

[6] In Cherry, the Court of Appeals of North Carolina held that only the State of North Carolina, acting through the Attorney General, has the authority to enforce public trust rights. 2012 WL 540742, at *6. The appellate court also rejected the Town's arguments that enforcing a nuisance ordinance against a property located in the public trust is distinct from enforcing the public trust itself. See id. at *5. However, the issue is far from settled. The Town has fifteen days from the issuance of the appellate court's mandate to petition the Supreme Court of North Carolina for discretionary review and has stated its intent to file such a petition. See N.C. R. App. P. 15(b). The appellate court's mandate did not issue until twenty days after the opinion was filed (which was on February 21, 2011). Id. 32(b). Furthermore, upon petition for discretionary review, the Supreme Court of North Carolina will likely stay the mandate until it can determine whether review is warranted. See id. 23(b). At present, this court is not prepared to say whether the North Carolina Court of Appeals accurately has predicted how the Supreme Court of North Carolina would (or will) rule on the issues in controversy in Cherry. Cf. Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (federal court construing state law should not create or expand state public policy); Twin Cities Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005) (in diversity cases, a court must predict how the state supreme court will resolve a contested issue of state law).

between City and State." 360 U.S. at 28. More generally, though, federal courts should be reluctant to interfere with a municipality's authority regarding land use. See Fralin & Waldron, 493 F.2d at 482; Caleb Stowe, 724 F.2d at 1080.

Of greatest concern, defendants ask the court to resolve profound, unresolved state-law issues that transcend the case at hand. Land use "involves important matters of state and local policy[.]" Meredith, 828 F.2d at 232; see Front Royal, 945 F.2d at 763 ("[L]and[-]use questions, . . . are the peculiar concern of local and state governments . . . ." (quotation omitted) (third alteration in original)); Browning-Ferris, 774 F.2d at 79 (same); see also Pomponio, 21 F.3d at 1327 ("We can conceive of few matters of public concern more substantial than zoning and land[-]use laws."). Moreover, use of North Carolina's beaches "raises fundamental questions of public policy." Machipongo, 579 F.2d at 875–76. The court is not "unmindful that an incorrect federal decision might adversely affect property owners throughout all of [North Carolina]'s coastal regions." Id. at 876; cf. Pomponio, 21 F.3d at 1327 ("[F]ederal courts should not leave their indelible print on local and state land[-]use and zoning law . . . ." (quotation omitted)). Given the far-reaching implications of the land-use issues that defendants raise, the court should defer to the state courts, which have "extensive familiarity and experience with such matters." Front Royal, 945 F.2d at 763 (quotation omitted); Caleb Stowe, 724 F.2d at 1080 (quotation omitted); Fralin & Waldron, 493 F.2d at 482.

Collectively, these considerations demonstrate that the primary issues raised by defendants' first six counterclaims are issues that are particularly within the province of North Carolina's courts. Accordingly, the court abstains from hearing counterclaims one through six and dismisses them without prejudice.

Alternatively, because the court may decline to render declaratory relief, it exercises that discretionary power here. First, defendants' first six counterclaims would require the court to resolve novel and important state-law issues. See, e.g., Kapiloff, 155 F.3d at 494; Ind-Com, 139

16

F.3d at 424; Mitcheson, 955 F.2d at 236, 238, 240; Am. Motorists, 306 F. Supp. 2d at 581; Chapman, 299 F. Supp. 2d at 563–64; Alpha Mech., 9 F. Supp. 2d at 588. Second, at these counterclaims' cores are not disputed facts, but rather important and novel issues of state law, which North Carolina courts are far better equipped to efficiently (and definitively) resolve. See Front Royal, 945 F.2d at 765; Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482. Third, because the litigation in Cherry raises similar issues of law and fact, a ruling by the court at this time "might create unnecessary 'entanglement' between the state and federal courts." Kapiloff, 155 F.3d at 494. Although there is no evidence of "procedural fencing," the court need not find that each factor has been satisfied in order to decline to exercise jurisdiction. See id. Due to the overriding federalism, efficiency, and comity concerns, the court declines to grant declaratory relief to defendants and dismisses their first six counterclaims without prejudice. See, e.g., Ind-Com, 139 F.3d at 422–23; Alpha Mech., 9 F. Supp. 2d at 587 & n.5.

## B.

Defendants also assert six counterclaims that essentially seek declarations that the Town lacked authority to enact Ordinance 10-07-021 and that the ordinance does not apply to the Cottage. Countercl. ¶¶ 163–252. The court dismisses these counterclaims because they are not ripe, because federal courts should abstain from intervening in land-use issues, and because federal courts should decline to provide declaratory relief that would require the resolution novel and important state-law issues.

These counterclaims are not ripe. Defendants do not contend that the Town denied them a permit due to Ordinance 10-07-021. In fact, defendants do not allege that they ever sought a building permit from the Town.[7] Instead, defendants appear to argue that judicial review is

---

[7] Although defendants have not applied for permits from the Town, they have applied for permits from Dare County and North Carolina to repair the Cottage's septic system. Countercl. ¶¶ 80–96. Dare County approved defendants' application. Id. ¶ 82. Defendants requested a permit from North Carolina on October 28, 2010. Id. ¶ 86. The state had not rendered a decision on

17

warranted because the Town threatened to deny defendants a permit. See id. ¶ 99. Defendants cannot challenge Ordinance 10-07-021 based solely on the Town's threatened or hypothetical denial of a permit. See, e.g., Texas v. United States, 523 U.S. 296, 300 (1998); O'Shea v. Littleton, 414 U.S. 488, 496 (1974). Rather, defendants must show that the Town's action "has been formalized and its effects felt in a concrete way . . . ." Pac. Gas & Elec. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 200 (1983) (quotation omitted). Because defendants do not allege that Ordinance 10-07-021 caused the Town to deny them a permit, their challenges to the ordinance are not ripe.

Alternatively, the court abstains from adjudicating these counterclaims because doing so would require the court to construe Ordinance 10-07-021, a municipal land-use regulation, see, e.g., Meredith, 828 F.2d at 232; Pomponio, 21 F.3d at 1327; Browning-Ferris, 774 F.2d at 79; Caleb Stowe, 724 F.2d at 1080; Machipongo, 579 F.2d at 876; Fralin & Waldron, 493 F.2d at 483, and determine the extent to which North Carolina has delegated its eminent domain power to the Town. See Thibodaux, 360 U.S. at 28; Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482. Although the court's rulings on counterclaims seven through twelve might not have as far-reaching effects as would rulings on defendants' first six counterclaims, the questions raised in counterclaims seven through twelve nevertheless involve novel and important issues of state and local concern. See Pomponio, 21 F.3d at 1327; Front Royal, 945 F.2d at 763; Meredith, 828 F.2d at 232; Browning-Ferris, 774 F.2d at 79. If defendants' counterclaims do ripen, the questions that they raise are better addressed in North Carolina state court. See Front Royal, 945 F.2d at 764–65; Caleb Stow, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482. Thus, the court abstains from hearing counterclaims seven through twelve.

---

defendants' request when defendants filed their counterclaims on January 21, 2011. Id. ¶ 90. Defendants allege that the state's permitting agent is a Town employee who is in cahoots with the Town to wrongfully delay the approval of defendants' application. See id. ¶¶ 91–92, 94–97.

18

Moreover, the court declines to exercise jurisdiction over these counterclaims for declaratory relief. Like defendants' first six counterclaims, resolving counterclaims seven through twelve would require the court to decide novel and important state-law issues regarding the Town's land-use authority. See, e.g., Kapiloff, 155 F.3d at 494; Ind-Com, 139 F.3d at 424; Mitcheson, 955 F.2d at 236, 238, 240; Am. Motorists, 306 F. Supp. 2d at 581; Chapman, 299 F. Supp. 2d at 563–64; Alpha Mech., 9 F. Supp. 2d at 588. North Carolina courts are best equipped to efficiently and finally resolve these counterclaims. See Front Royal, 945 F.2d at 764–65; Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482; cf. Kapiloff, 155 F.3d at 493. Federalism, efficiency, and comity concerns weigh in favor of the court's declining to grant declaratory relief on counterclaims seven through twelve. See, e.g., Ind-Com, 139 F.3d at 422–23; Alpha Mech., 9 F. Supp. 2d at 587 & n.5. Accordingly, the court dismisses counterclaims seven through twelve without prejudice.

C.

Defendants also seek declarations that the Town's actions violated defendants' substantive and procedural due process rights under the United States and North Carolina Constitutions. Countercl. ¶¶ 253–60. The court dismisses these counterclaims because at their cores are state-law land-use issues and because the court is reluctant to provide declaratory relief when doing so would require it to resolve novel and important state-law issues.

A federal claim that rests on a violation of state law is "a state[-]law [claim] in federal[-] law clothing." Martin, 499 F.3d at 368 (quotation omitted) (second alteration in original); Johnson, 199 F.3d at 721 (quotation omitted); see Shirvinski v. United States, __ F.3d __, 2012 WL 764464, at *3, *5 (4th Cir. 2012); Pomponio, 21 F.3d at 1326. Federal courts abstain from hearing such claims "[b]ecause of the diminished federal interest in adjudicating [them] and the heightened threat [that federal adjudication of them] pose[s] to uniform state regulation[.]" Martin, 499 F.3d at 368; see also Johnson, 199 F.3d at 721; cf. Burford, 319 U.S. at 317. Defendants

19

allege that the Town violated their substantive due process rights by arbitrarily and capriciously issuing and enforcing the Nuisance Declaration. See Countercl. ¶¶ 253–56. However, close examination of this counterclaim reveals that defendants are simply recasting their first twelve state-law counterclaims as one federal constitutional claim. Defendants reason that because the Town did not have authority to enact and enforce Ordinances 16-31(6)(c) and 10-07-021, the Town's actions were necessarily arbitrary and capricious. Thus, according to defendants, because the Town acted arbitrarily and capriciously, it violated defendants' substantive due process rights. See id. A violation of state law is a necessary antecedent to defendants' federal constitutional counterclaim. Hence, defendants have given their state-law counterclaims federal clothing. See Johnson, 199 F.3d at 721–22; Pomponio, 21 F.3d at 1326. Likewise, defendants allege that the Town acted arbitrarily and capriciously and did not comply with "local, state or federal law," thus depriving them of their federal rights to procedural due process. See Countercl. ¶¶ 257–60. Again, the Town's alleged non-compliance with state law is at this counterclaim's heart.[8] Defendants' "[f]ederal [counter]claims rest . . . on allegations that a state agency . . . violated state law," Martin, 499 F.3d at 368, and, as discussed, the state laws at issue regulate land use, a matter into which federal courts are reluctant to delve. See Pomponio, 21 F.3d at 1328; Front Royal, 945 F.2d at 764–65; Beacon Hill, 875 F.2d at 1085 n.6; Meredith, 828 F.2d at 231–32; Browning-Ferris, 774 F.2d at 79; Caleb Stowe, 724 F.2d at 1080; Machipongo, 579 F.2d at 875–76; Fralin & Waldron, 493 F.2d at 482–83. Federal courts should avoid "adjudicat[ing] . . . disputes involving the most sensitive questions of state law and policy that arrive at their door[s] under the guise of federal

---

[8] Defendants claim that the Town violated their procedural due process rights by not complying with "the procedural requirements of applicable . . . federal law." Countercl. ¶ 258. Defendants do not identify any federal statutory or administrative procedural requirements that the Town allegedly violated. Therefore, the only applicable federal law is the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Relying on the Due Process Clause, however, is a circular argument: the Town violated defendants' federal procedural due process rights by violating defendants' federal procedural due process rights. Accordingly, defendants' procedural due process counterclaims can rest only on the Town's alleged violation of state law.

claims." Johnson, 199 F.3d at 721. Accordingly, the court abstains from entertaining defendants' federal due process counterclaims.

The court has an even greater interest in not deciding whether the Town violated defendants' rights guaranteed by the North Carolina Constitution. Defendants' counterclaims allege that the Town violated the North Carolina Constitution when it violated state law—these counterclaims are state statutory claims clothed in the state constitution. The court will not peel through these counterclaims and in so doing construe the state constitution and land-use regulations. Cf. Pomponio, 21 F.3d at 1327; Front Royal, 945 F.2d at 763; Meredith, 828 F.2d at 232; Browning-Ferris, 774 F.2d at 79. Accordingly, the court abstains from adjudicating defendants' counterclaims grounded in the Law of the Land Clause in the North Carolina Constitution.

Alternatively, the court declines to exercise jurisdiction over defendants' requests for declaratory relief. As discussed, counterclaims thirteen and fourteen are essentially defendants' first twelve counterclaims recast as constitutional claims. Consequently, to grant defendants' requested relief, the court would need to delve into novel and important state-law issues. See, e.g., Kapiloff, 155 F.3d at 494; Ind-Com, 139 F.3d at 424; Mitcheson, 955 F.2d at 236, 238, 240; Am. Motorists, 306 F. Supp. 2d at 581; Chapman, 299 F. Supp. 2d at 563–64; Alpha Mech., 9 F. Supp. 2d at 588. North Carolina's courts are far better equipped to resolve these legal issues. See Front Royal, 945 F.2d at 765; Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482; cf. Kapiloff, 155 F.3d at 493. Federalism, efficiency, and comity concerns weigh in favor of the court's declining to grant declaratory relief on counterclaims thirteen and fourteen. See, e.g., Ind-Com, 139 F.3d at 422–23; Alpha Mech., 9 F. Supp. 2d at 587 & n.5. In sum, the court dismisses counterclaims thirteen and fourteen without prejudice.

### D.

Additionally, defendants seek a declaration that the Town's actions violated defendants'

21

equal protection rights under both the United States and North Carolina Constitutions. Countercl. ¶¶ 261–68. To prevail on a federal equal protection claim, defendants must show that the Town treated them differently than it treated similarly situated individuals. See, e.g., Morrison v. Garraghty, 239 F.3d 648, 653–54 (4th Cir. 2001). Defendants allege that the Town did so by enforcing Ordinance 16-31(6) against them as the Cottage's owners, but not against owners of other beach houses located partially or wholly in the "public trust area." Countercl. ¶¶ 262–65. Admittedly, this counterclaim is not a prototypical "state[-]law [claim] in federal law clothing." Martin, 499 F.3d at 368 (quotation omitted) (second alteration in original); Johnson, 199 F.3d at 721 (quotation omitted). Yet, to determine whether other beach house owners were actually situated similarly to defendants, the court would need to define the term "public trust area." See Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482–83. Not only does the court have inadequate state-law guidance to construe this term, see Burford, 319 U.S. at 331; Machipongo, 579 F.2d at 87, but the court's ruling on the issue would have implications beyond the case at hand. See Machipongo, 579 F.2d at 876; cf. Pomponio, 21 F.3d at 1327. Accordingly, the court abstains from hearing defendants' fifteenth counterclaim.

Similar to defendants' state Law of the Land Clause counterclaims, the court has an even greater interest in not entertaining defendants' contention that the Town violated their equal protection rights secured by the North Carolina Constitution. Defendants' argument is a state-law claim wrapped in a state constitutional claim. Accordingly, the court abstains from entertaining defendants' state equal protection counterclaim.

Alternatively, the court declines to exercise jurisdiction over defendants' requests for declaratory relief. To grant defendants' requested declaratory relief, the court would need to delve into novel and important state-law issues. See, e.g., Kapiloff, 155 F.3d at 494; Ind-Com, 139 F.3d at 424; Mitcheson, 955 F.2d at 236, 238, 240; Am. Motorists, 306 F. Supp. 2d at 581; Chapman, 299 F. Supp. 2d at 563–64; Alpha Mech., 9 F. Supp. 2d at 588. North Carolina courts are better

22

equipped to resolve these issues. See Front Royal, 945 F.2d at 765; Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482; cf. Kapiloff, 155 F.3d at 493. Federalism, efficiency, and comity concerns weigh in favor of the court's declining to grant declaratory relief on counterclaim fifteen. See, e.g., Ind-Com, 139 F.3d at 422–23; Alpha Mech., 9 F. Supp. 2d at 587 & n.5. Accordingly, the court dismisses counterclaim fifteen without prejudice.

E.

Defendants also seek damages pursuant to 42 U.S.C. § 1983 alleging that the Town violated defendants' federal constitutional rights. Countercl. ¶¶ 269–73. To state a section 1983 claim, defendants must show that the Town deprived them of a federal right and did so under color of state law. See Gomez v. Toledo, 446 U.S. 635, 640 (1980); Hall v. Quillen, 631 F.2d 1154, 1155–56 & nn. 2–3 (4th Cir. 1980). A section 1983 claim fails as a matter of law where there is no underlying constitutional violation. See, e.g., Young v. City of Mount Ranier, 238 F.3d 567, 579 (4th Cir. 2001); Grayson v. Peed, 195 F.3d 692, 697 (4th Cir. 1999); S.P. v. City of Takoma Park, Md., 134 F.3d 260, 274 (4th Cir. 1998). Because the court abstains from determining whether the Town violated defendants' federal constitutional rights, the court abstains from determining whether the Town is liable under section 1983. Accordingly, the court stays defendants' sixteenth counterclaim. See, e.g., Quackenbush, 517 U.S. at 721; Johnson, 199 F.3d at 727–28.

F.

Defendants next ask the court to enjoin the Town from assessing and collecting civil penalties, and taking "any other adverse action" against defendants.[9] Countercl. ¶¶ 274–82. Before enjoining the Town's enforcement actions, the court would need to construe a municipal land-use regulation, see Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482–83,

---

[9] Because the Town withdrew the Nuisance Declaration, defendants' request to enjoin demolition of the Cottage is moot. See Countercl. ¶ 282(a).

and scrutinize the state authority delegated to the Town. See Thibodaux, 360 U.S. at 28; Caleb Stowe, 724 F.2d at 1080; Fralin & Waldron, 493 F.2d at 482. Considering either matter would require the court to delve into important areas of state prerogative, see Pomponio, 21 F.3d at 1327; Front Royal, 945 F.2d at 763; Meredith, 828 F.2d at 232; Browning-Ferris, 774 F.2d at 79; Machipongo, 597 F.2d at 876, without adequate state-law guidance. See Burford, 319 U.S. at 331; Machipongo, 579 F.2d at 87. To avoid creating "needless friction by unnecessarily enjoining state officials from executing domestic policies," Thibodaux, 360 U.S. at 33, the court abstains from hearing counterclaim seventeen and dismisses the counterclaim without prejudice.

G.

Through counterclaims eighteen and nineteen, defendants seek compensation under the United States and North Carolina Constitutions for the Town's alleged uncompensated regulatory taking of the Cottage. Countercl. ¶¶ 283–306. Defendants cannot prevail on a federal takings claim until first seeking and being denied compensation from the state. See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172, 195 (1985); Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016, 1019–20 (1984). Defendants may only seek such compensation by commencing an inverse condemnation proceeding. See N.C. Gen. Stat. § 40A-51. Similarly, inverse condemnation is the exclusive remedy for a taking in violation of the North Carolina Constitution. Long v. City of Charlotte, 306 N.C. 187, 196–97, 293 S.E.2d 101, 107–08 (1982); Harwood v. City of Concord, 201 N.C. 781, 781, 161 S.E. 534, 535 (1931) (per curiam).[10] Therefore, at this time, defendants' sole means of seeking compensation for the alleged regulatory

---

[10] Although the North Carolina Constitution does not expressly prohibit governments from taking of property without compensation, the Supreme Court of North Carolina has inferred such a prohibition from the Law of the Land Clause, N.C. Const. art. I, § 19. Finch v. City of Durham, 325 N.C. 352, 362–63, 384 S.E.2d 8, 14 (1989). The standard for determining whether a government took property in violation of the North Carolina Constitution is the same as the standard used to assess federal takings claims. See, e.g., id. at 371–72, 384 S.E.2d at 19; N.C. Dep't of Transp. v. Cromartie, __ N.C. App. __, 716 S.E.2d 361, 367 (2011).

taking is an inverse condemnation action, which defendants have initiated through their nineteenth counterclaim. See Countercl. ¶¶ 293–306. Thus, counterclaim eighteen is unripe and is dismissed.

As for counterclaim nineteen, compensation is not required when a novel regulatory restriction already "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." Lucas, 505 U.S. at 1029. Thus, "a taking does not occur when a state eliminates a nuisance." Trobough v. City of Martinsburg, No. 96-1607, 1997 WL 425688, at *3 (4th Cir. July 30, 1997) (unpublished) (citing Keystone Bituminous Coal Ass'n v. DeBenedictus, 480 U.S. 470, 489–91 (1987); Lucas, 505 U.S. at 1023–24). Critically, though, a nuisance ordinance does not necessarily stem from a "background principle of [a] State's law." For a government to avoid paying compensation for a regulatory taking, a regulation must be "derived from a State's legal tradition." Palazzolo v. Rhode Island, 533 U.S. 606, 630 (2001).

Because defendants contend that the Town's enforcement of Ordinance 16-31(6) caused the alleged regulatory taking, the court would first need to decide whether the ordinance is derived from North Carolina law's "background principles." See Lucas, 505 U.S. at 1029. It might be that Ordinance 16-31(6) comes from such a background principle, especially if the ordinance reflects the "public trust" as recognized by N.C. Gen. Stat. § 77-20. However, for the court to make this determination, it would need to construe a local ordinance and a state statute, without adequate guidance as to either. In addition, the court would have to decide whether North Carolina bestowed the authority on the Town to abate a nuisance. Resolving these issues would require inquiries identical to those required by counterclaims one through six, and the issues' complexity and importance to North Carolina warrants the court's abstention. Accordingly, the court stays counterclaim nineteen. See, e.g., Quackenbush, 517 U.S. at 721; Johnson, 199 F.3d at 727–28.

H.

Defendants also allege that the Town slandered their title by repeatedly stating that the

25

Cottage is in the public trust area. Countercl. ¶¶ 307–15. Slander of title occurs when an individual maliciously makes false statements about the title of another's property, thus causing special damages. See Mecimore v. Cothren, 109 N.C. App. 650, 654, 428 S.E.2d 470, 473 (1993). It appears, however, that the Town's statements that give rise to the counterclaim were only false if the Cottage is outside of the public trust area. Thus, resolution of this counterclaim would depend on resolving the issues contained in the first six counterclaims. The court abstains from addressing theses issues and stays counterclaim twenty. See, e.g., Quackenbush, 517 U.S. at 721; Johnson, 199 F.3d at 727–28.

I.

Defendants next assert that the Town was negligent under North Carolina law in failing to properly inspect the Cottage before declaring that the Cottage violated Ordinance 16-31(6). Countercl. ¶¶ 316–21. To determine whether the Town acted negligently in declaring the Cottage a nuisance, the court would need to construe Ordinance 16-31(6). Doing so would entail the same problems inherent in adjudicating defendants' first six counterclaims. Because the court abstains from addressing these issues, it stays counterclaim twenty-one. See, e.g., Quackenbush, 517 U.S. at 721; Johnson, 199 F.3d at 727–28.

J.

Finally, the Town raises two claims seeking an abatement order against the Cottage, Am. Compl. ¶¶ B–C, and another that seeks civil penalties for defendants' refusal to comply with the Nuisance Declaration. Id. ¶ D. In light of the Town having withdrawn the Nuisance Declaration, the Town no longer seeks an order of abatement, making the Town's first two claims moot. The Town's third claim, however, is not moot. To grant the Town's request, though, the court would need to resolve the various state-law issues that defendants' first six counterclaims raise. Accordingly, the court stays the Town's third claim. See, e.g., Quackenbush, 517 U.S. at 721; Johnson, 199 F.3d at 727–28.

IV.

Each claim and counterclaim in this case is a variation on a fundamental state-law question—to what extent can a municipality enforce land-use ordinances against private beachfront property owners? The ultimate answer to this question will "reflect a delicate trade-off" between individual liberty and social utility on North Carolina coast, and federal courts have recognized that "state authority has long been preeminent" in such areas of law and policy. See Johnson, 199 F.3d at 720. Accordingly, the issues at this case's heart should "be committed above all to the legislative, judicial, and regulatory processes of [North] Carolina." See id. at 715. Therefore, in deference to federalism and comity, see, e.g., Martin, 499 F.3d at 363; Ind-Com, 139 F.3d at 422–23, the court declines to exercise jurisdiction over the case at this time. Accordingly, the court DISMISSES without prejudice defendants' first through fifteenth, seventeenth, and eighteenth counterclaims, and dismisses the Town's first and second claims. The court STAYS defendants' sixteenth, nineteenth, twentieth, and twenty-first counterclaims, and the Town's third claim. The court GRANTS in part and DISMISSES in part without prejudice the Town's motion to dismiss [D.E. 17]. The Court DENIES without prejudice defendants' motion for partial summary judgment [D.E. 25].

SO ORDERED. This 28 day of March 2012.

JAMES C. DEVER III
Chief United States District Judge