# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### NORTHERN DIVISION
#### No. 2:11-CV-1-D

| | |
|---|---|
| TOWN OF NAGS HEAD, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **ORDER** |
| | ) |
| MATTHEW A. TOLOCZKO, | ) |
| and LYNN B. TOLOCZKO, | ) |
| | ) |
| Defendants. | ) |

Fundamentally, this case concerns whether the Town of Nags Head ("Town") committed a taking in violation of the Fifth Amendment to the United States Constitution and the Law of the Land Clause of the North Carolina Constitution by declaring the beachfront cottage ("Cottage") of Matthew and Lynn Toloczko ("Toloczkos") a public nuisance and ordering the Cottage's removal without offering the Toloczkos an opportunity to repair it. The controversy arose after a major storm struck the Town on November 12, 2009. The storm eroded the beach in front of the Toloczkos' Cottage, and damaged the Cottage itself. On November 30, 2009, the Town condemned the Cottage, declared it a public nuisance, and ordered the Toloczkos to remove or destroy it. The Town's decision to declare the Cottage a public nuisance was based, in part, on the Town's view that the Cottage was located in a public trust area—that is, an area for which, under North Carolina law, the State holds certain property rights in trust for the public. The Toloczkos disagreed that their Cottage was located in a public trust area, refused to remove or destroy their Cottage, and asked for permission to repair it to a habitable state.

In years past, when a storm damaged the Cottage, the Town had permitted the Toloczkos to make repairs. After the 2009 storm, however, the Town refused to do so. Instead, on December 6, 2010, the Town initiated this litigation by suing the Toloczkos in Dare County Superior Court, seeking an order of abatement and civil penalties against the Toloczkos. See [D.E. 1-2]. The Town amended its complaint on January 6, 2011. See [D.E. 1-3]. The complaint makes three claims:

(1) An order of abatement pursuant to N.C. Gen. Stat. § 160A-175. Am. Compl. ¶ B.

(2) In the alternative, an order of abatement pursuant to N.C. Gen. Stat. § 160A-193. Id. ¶ C.

(3) Recovery of civil penalties pursuant to N.C. Gen. Stat. § 160A-175. Id. ¶ D.

On January 7, 2011, the Toloczkos removed the action to this court based on diversity jurisdiction. See [D.E. 1]; 28 U.S.C. § 1332. On January 21, 2011, the Toloczkos filed an answer and asserted twenty-one counterclaims against the Town [D.E. 7]:

(1) Declaratory judgment that the Cottage is not in the "[p]ublic [t]rust" area. Countercl. ¶¶ 106–14.

(2) Declaratory judgment that the Town's enactment of Ordinance 16-31(6)(c) exceeded the Town's state statutory authority. Id. ¶¶ 115–22.

(3) Declaratory judgment that the Town's ordering defendants to demolish the Cottage violated N.C. Gen. Stat. §§ 160A-441 to -450. Id. ¶¶ 123–30.

(4) Declaratory judgment that the Cottage is "not likely to cause personal or property injury." Id. ¶¶ 131–37.

(5) Declaratory judgment that the Town lacks the authority to declare structures on the "dry sand beach" nuisances solely because they are on the "dry sand beach." Id. ¶¶ 138–53.

(6) Declaratory judgment that Ordinance 16-31(6)(c) does not authorize the Town to declare as nuisances structures located on the "dry sand beach." Id. ¶¶ 154–62.

2

(7)     Declaratory judgment that N.C. Gen. Stat. § 143-138 preempts Ordinance 10-07-021. Id. ¶¶ 163–78.

(8)     Declaratory judgment that the Town's enactment of Ordinance 10-07-021 exceeded the Town's zoning authority. Id. ¶¶ 179–91.

(9)     Declaratory judgment that the Town's enactment of Ordinance 10-07-021 exceeded the Town's nuisance authority. Id. ¶¶ 192–209.

(10)    Declaratory judgment that Ordinance 10-07-021 unlawfully delegates the Town's zoning power to the town manager. Id. ¶¶ 210–21.

(11)    Declaratory judgment that the Cottage is not subject to Ordinance 10-07-021. Id. ¶¶ 222–31.

(12)    Declaratory judgment that the Town's enactment of Ordinance 10-07-021 violated defendants' vested rights to the application of the Town's unamended ordinances. Id. ¶¶ 232–52.

(13)    Declaratory judgment that the Town's actions deprived defendants of their substantive due process rights as provided by the United States and North Carolina Constitutions. Id. ¶¶ 253–56.

(14)    Declaratory judgment that the Town's actions deprived defendants of their procedural due process rights as provided by the United States and North Carolina Constitutions. Id. ¶¶ 257–60.

(15)    Declaratory judgment that the Town's actions deprived defendants of equal protection under the law as provided by the United States and North Carolina Constitutions. Id. ¶¶ 261–68.

(16)    The Town acted under color of state law to deprive defendants of their rights secured by the Fifth and Fourteenth Amendments of the United States Constitution, in violation of 42 U.S.C. § 1983. Id. ¶¶ 269–73.

(17)    Preliminary and permanent injunctions against the Town's demolishing the Cottage. Id. ¶¶ 274–82.

(18)    The Town's actions were a regulatory taking under the United States and North Carolina Constitutions. Id. ¶¶ 283–92.

(19)    Initiation of an inverse condemnation proceeding against the Town. Id. ¶¶ 293–306.

(20)    The Town slandered defendants' property title. Id. ¶¶ 307–15.

3

(21) The Town was negligent in determining that the Cottage violated Ordinance 16-31(6). Id. ¶¶ 316–21.

On March 28, 2012, this court dismissed certain claims and counterclaims and abstained from deciding other claims and counterclaims. Town of Nags Head v. Toloczko, 863 F. Supp. 2d 516, 519 (E.D.N.C. 2012). On appeal, the United States Court of Appeals for the Fourth Circuit held that, in Town of Nags Head v. Cherry, Inc., 723 S.E.2d 156 (N.C. Ct. App.), disc. rev. denied, 366 N.C. 386, 733 S.E.2d 85 (2012), the North Carolina Court of Appeals clarified the issues raised in this case sufficiently such that abstention was no longer appropriate, and remanded the case. Town of Nags Head v. Toloczko, 728 F.3d 391, 398–400 (4th Cir. 2013).

On November 6, 2013, the court held a status conference and established a briefing schedule [D.E. 68]. On December 6, 2013, the parties submitted supplemental memorandums concerning the remaining claims and counterclaims and cross-moved for summary judgment [D.E. 72, 73]. On December 20, 2013, the parties submitted responses [D.E. 74, 75]. On June 11, 2014, the court heard oral argument. [D.E. 89]; see Oral Arg. Tr. [D.E. 91]. As explained below, the court grants summary judgment to the Toloczkos on the Town's third claim and on the Toloczkos' first, second, fourth, and fifth counterclaims. The court grants summary judgment to the Town on the Toloczkos' physical-occupation takings claim in the sixteenth, eighteenth, and nineteenth counterclaims, but denies summary judgment to the Town and the Toloczkos on the Toloczkos' temporary regulatory takings claim in the sixteenth, eighteenth, and nineteenth counterclaims. The court also grants summary judgment to the Town on the Toloczkos' twentieth and twenty-first counterclaims, and dismisses the Toloczkos' third and sixth counterclaims as moot.

I.

Nags Head, North Carolina sits beside the Atlantic Ocean on North Carolina's Outer Banks.

4

Those who own oceanfront property in Nags Head reap substantial benefits from the property's location, but they also face heightened risk of property damage due to storms and beach erosion. In May 1988, the Town amended its code to establish when such erosion or storm damage could render a structure a public nuisance. See Nags Head, N.C., Ordinance 88-05-16 (May 2, 1988) [D.E. 30-11]. Under the ordinance,

> [t]he existence of any of the following conditions associated with storm-damaged or erosion-damaged structures or their resultant debris shall constitute a public nuisance.
>
> (a) Damaged structure in danger of collapsing;
>
> (b) Damaged structure or debris from damaged structures where it can reasonably be determined that there is a likelihood of personal or property injury;
>
> (c) Any structure, regardless of condition, or any debris from damaged structure which is located in whole or in part in a public trust area or public land.

Nags Head, N.C., Code ("Town Code") § 16-31(6) ("Nuisance Ordinance"). Subsection (c), unlike the other two subsections, concerns only a structure's location, not its condition. Even if a structure is in perfect condition, it is a nuisance under subsection (c) if it is located in a public trust area—and the only way to abate the nuisance is to remove the structure from that area.

The Nuisance Ordinance does not define the term "public trust area," but the Town has interpreted it to include land that is subject to public trust rights, which are "those rights held in trust by the State [of North Carolina] for the use and benefit of the people of the State in common," including "the right to freely use and enjoy the State's ocean and estuarine beaches and public access to the beaches." Friends of Hatteras Island Nat'l Historic Maritime Forest Land Trust for Pres., Inc. v. Coastal Res. Comm'n, 117 N.C. App. 556, 574, 452 S.E.2d 337, 348 (1995) (quoting N.C. Gen. Stat. § 1-45.1). Although the matter is unsettled under North Carolina law, the Town contends that

5

public trust rights apply to the entire beach, both the wet-sand and dry-sand portions. See, e.g., 2013 Amends. to Town of Nags Head Land Use Plan [D.E. 90-1] 6 ("2013 LUP Amends.").[1] Thus, under subsection (c) of the Nuisance Ordinance, as the Town interprets it, any structure located on any part of the beach is a nuisance.

Although subsection (c) of the Nuisance Ordinance purports to render every structure in Nags Head located "in whole or in part in a public trust area or public land" a public nuisance—and thus to authorize the Town to require that every such structure be demolished or removed—the Town has not attempted to enforce subsection (c) in this way. Instead, the Town developed an informal, de facto enforcement standard. In the words of the town manager, "If a house is obstructing the use of the beach it's a nuisance. Once a house is predominantly under any condition routinely restricting the public's use and enjoyment of the beach, I have declared it a nuisance." Ogburn Dep. [D.E. 72-13] 220, Sept. 14, 2011; see also Oakes Dep. [D.E. 38-10] 209–14.

Matthew and Lynn Toloczko own fee-simple title to beachfront land located at 119 East Seagull Drive in Nags Head. On that land sits the Cottage, which Lynn Toloczko's father built in 1978. Since becoming the owners of the Cottage in 1995, the Toloczkos have maintained and repaired it, used it themselves, and rented it. When the Cottage was built, a dune separated it from

---

[1] Under North Carolina law, the wet-sand beach is that portion of the beach seaward of the mean high-tide line, and is owned by the State of North Carolina. The dry-sand beach is that portion of the beach landward of the mean high-tide line, and can be privately owned. N.C. Gen. Stat. § 77-20(a); see Joseph J. Kalo, The Changing Face of the Shoreline: Public and Private Rights to the Natural and Nourished Dry Sand Beaches of North Carolina, 78 N.C. L. Rev. 1869, 1879 (2000). The mean high-tide line is a surveyed line on the beach at the average elevation reached by the water at high tide over a period of 18.6 years. Id. at 1882–83; see Borax Consol., Ltd. v. City of Los Angeles, 296 U.S. 10, 26–27 (1935); Carolina Beach Fishing Pier, Inc. v. Town of Carolina Beach, 277 N.C. 297, 303, 177 S.E.2d 513, 516 (1970). During the time period relevant to this lawsuit, high tides usually have come higher on the beach than the mean high-tide line. Thus, portions of the beach that are landward of the mean high-tide line, and therefore legally part of the dry-sand beach, have in fact often not been dry. See Ogburn Dep. [D.E. 72-25] 146, Mar. 31, 2011.

the beach. See Lynn Toloczko Dep. [D.E. 30-8] 8. Over the years, the beach gradually eroded, and the Cottage came to be located (in the Town's view) on the beach itself, as did several other nearby cottages. According to the Town, the Cottage therefore was located "in a public trust area," and constituted a nuisance under subsection (c) of the Nuisance Ordinance. See Town Code § 16-31(6)(c). Initially, the Town refrained from enforcing the Nuisance Ordinance against the Cottage, apparently because it did not "routinely restrict the public's use and enjoyment of the beach," and thus did not meet the Town's informal enforcement standard. In fact, through early November 2009, the Town repeatedly allowed the Toloczkos to continue making necessary repairs and updates to the Cottage, even though it was located (in the Town's view) on the beach. See, e.g., Matthew Toloczko Aff. [D.E. 38-2] ¶ 14 & Ex. A [D.E. 38-3], Nov. 7, 2011.

On November 12, 2009, a powerful storm struck Nags Head and substantially eroded the remaining beach in front of the Cottage, damaged the Cottage, and left the Cottage's septic tank exposed. After inspecting the post-storm state of the Cottage, the Town sent a letter dated November 30, 2009, to the Toloczkos informing them that the Cottage created "a likelihood of personal or property injury" and that it was "located in whole or in part in a public trust area," and accordingly declaring the Cottage to be a nuisance under subsections (b) and (c) of the Nuisance Ordinance. [D.E. 7-1] ("Nuisance Declaration"); see Town Code § 16-31(6)(b), (c). The determinations under subsections (b) and (c) were related: the fact that the Cottage was located in what the Town viewed as an area open to the public made the damaged state of the Cottage more likely to pose a danger of injury to the public. See Ogburn Dep. 205–06, Mar. 31, 2011 ("My concern was that since these homes are in whole or in part on the public trust[,] . . . the people that have the right to be in that area are going to be subject to injury from the damaged structure and debris.").

Because the Nuisance Declaration was based on the Cottage's location, and not just its

7

condition, the Town determined that even if the Toloczkos repaired the Cottage, it would remain a nuisance. See Ogburn Dep. 30, Sept. 14, 2011. Thus, the Town ordered the Toloczkos "to promptly abate [the] nuisance by demolishing and/or removing the structure and any accessory structures within 18 days," and warned the Toloczkos that if they failed to demolish or remove the Cottage, the Town would begin issuing civil citations in the amount of $100 per day. [D.E. 7-1]. In addition, the Town informed the Toloczkos that it would not issue any building permits for repairs to the Cottage, see id., and instructed the Town staff accordingly. See Ogburn Dep. 29–30, Sept. 14, 2011; Ogburn Dep. 165–66, Mar. 31, 2011. The Toloczkos refused to demolish the Cottage, and on January 27, 2010, the Town began assessing $100-per-day civil penalties against the Toloczkos. See Am. Compl. [D.E. 1-3], Ex. B. Before the Nuisance Declaration, the Toloczkos' property (including the Cottage) was valued at $175,000. See [D.E. 72-24]. After the Nuisance Declaration, Dare County listed the Toloczkos' property in the Dare County property records as "WASHOUT," with a value of $0. Skeen Aff. [D.E. 72-11] 2.

Sometime between November 2009 and March 2010, the Town realized that it did not have the legal authority to deny building permits for a structure just because it had been declared a nuisance. See Ogburn Dep. 27–31, Sept. 14, 2011; Ogburn Dep. 168–71, Mar. 31, 2011. Not wanting to issue building permits for structures it had ordered to be removed or destroyed, the Town's Board of Commissioners enacted Ordinance No. 10-07-021 on July 7, 2010. Ordinance No. 10-07-021 gave the Town the legal authority it had lacked. Nags Head, N.C., Ordinance No. 10-07-021 (July 7, 2010) [D.E. 72-9] ("Ordinance 10-07-021"); see Oakes Dep. 218–20; [D.E. 38-15] (Transcript of July 7, 2010 meeting of the Nags Head Town Council). Specifically, Ordinance 10-07-021 amended the Town's zoning ordinances to define as "prohibited" structures located

(i) Wholly within the wet sand area of the public trust beach area, i.e., on the State

8

Case 2:11-cv-00001-D   Document 92   Filed 08/18/14   Page 8 of 34

owned property seaward of the mean high water mark; or

(ii) Wholly or partially within any portion of the public trust beach area in such a manner that the building or structure impedes the flow of vehicular, pedestrian, or emergency services traffic at normal high tide.

Town Code § 48-87(c).[2] Furthermore, Ordinance 10-07-021 specified that any structure that had been declared a nuisance pursuant to subsection (c) of the Nuisance Ordinance would automatically be considered "prohibited." Id. Ordinance 10-07-021 also declared that no building permit could be issued for a prohibited structure, other than permits to remove or demolish the structure. Id.; see id. § 16-33(6)(c).

Barred by Ordinance 10-07-021 from receiving the necessary building permits, the Toloczkos were unable to strengthen the pilings or install cross bracing underneath the Cottage, unable to repair the deck and steps attached to the Cottage, and unable to connect any utilities or a septic system to the Cottage. See [D.E. 39-3] ¶¶ 16–20. Thus, the Cottage remained uninhabitable and the Toloczkos were unable to rent, use, or otherwise enjoy the Cottage. See Matthew Toloczko Aff. ¶ 8, Nov. 7, 2011.

On August 6 and 7, 2011, the Town renourished the portion of the beach in front of the Cottage with additional sand. See Ogburn Dep. 157, Sept. 14, 2011. After renourishment, the Town found that the Cottage "no longer impermissibly or unacceptably restrict[ed] or obstruct[ed] the use of and access to the ocean beach," and on September 14, 2011, it withdrew the Nuisance Declaration and seemingly stopped assessing the associated $100-per-day civil penalties against the Toloczkos.

---

[2] Ordinance 10-07-021 defined the term "public trust beach area" to include both the wet-sand and dry-sand portions of the beach, consistent with the Town's interpretation of the term "public trust area" in subsection (c) of the Nuisance Ordinance.

9

[D.E. 39-1]; see Ogburn Dep. 155–56, 211, Sept. 14, 2011.[3] Nonetheless, the town manager has acknowledged that he still considers the Cottage to be "in a public trust area" under subsection (c) of the Nuisance Ordinance, and that the Town could therefore redeclare the Cottage to be a nuisance at any time. See Ogburn Dep. 161–62, Sept. 14, 2011; cf. Toloczko, 728 F.3d at 394 n.3.

Once the Town withdrew the Nuisance Declaration, Ordinance 10-07-021 no longer barred the Toloczkos from obtaining building permits, and they began their efforts to repair the Cottage. See Matthew Toloczko Aff. [D.E. 72-28] ¶ 3, Dec. 5, 2013. Among the first tasks was to install a new septic tank, since the November 2009 storm had destroyed the old one. See Matthew Toloczko Aff. [D.E. 26-2] ¶ 6, June 9, 2011. The Toloczkos already had obtained authorization from the Dare County Department of Public Health to install a new septic tank. See id., Ex. D. That authorization, however, was contingent on the Toloczkos' obtaining the "minor development permit" required under North Carolina's Coastal Area Management Act ("CAMA") for any sort of construction work in an "area of environmental concern" such as the oceanfront beach. See id.; Matthew Toloczko Aff. ¶ 4, Dec. 5, 2013; Allen Aff. [D.E. 46-10] ¶ 3, Dec. 7, 2011; N.C. Gen. Stat. §§ 113A-103(5)a., 113A-118(a), (d)(2). Although the Town normally processes CAMA minor development permit applications on behalf of North Carolina's Division of Coastal Management ("DCM"), in this case, due to the ongoing litigation, the Town asked DCM to process the application. See Allen Aff. [D.E. 53-3] ¶ 2, Mar. 16, 2012. DCM did so, and on February 27, 2012, DCM denied the Toloczkos' application upon finding that, due to the Cottage's proximity to the ocean, installing a new septic tank for the Cottage would violate both CAMA guidelines and the Town's Land Use Plan. See

---

[3] At oral argument, the Town's attorney initially stated that the Toloczkos owed $100 per day in civil penalties from November 30, 2009, until the Toloczkos began repairing the Cottage in 2013. See Oral Arg. Tr. 4, 7–8. Later in the argument, the Town's attorney stated that the Toloczkos owed $100 per day in civil penalties from November 30, 2009, until September 14, 2011. See id. 53.

10

Matthew Toloczko Aff. ¶ 8 & Ex. A, Dec. 5, 2013. The Toloczkos appealed, and ultimately reached a settlement with DCM through which DCM agreed to exempt the proposed repairs to the Cottage from the CAMA minor-development-permit requirement. The Toloczkos received the letter of exemption from DCM on August 2, 2013. See id. ¶¶ 9–10. By then, their authorization for septic-tank work from the Dare County Department of Public Health was over two years old; therefore, the Toloczkos obtained an updated authorization on September 5, 2013. See id. ¶ 11.

Finally, at that point, the Toloczkos could obtain a building permit from the Town to repair the Cottage. After some wrangling with the Town about whether their exemption from the CAMA minor-development-permit requirement was valid, on or about October 21, 2013, the Toloczkos submitted their building permit application. The Town granted the application on November 15, 2013, and the Toloczkos promptly began making the necessary repairs. See id. ¶¶ 13–14. As of June 10, 2014, the Toloczkos had obtained financing for the repairs and had engaged a contractor, who anticipates that the repairs will be complete in September or October 2014. See Matthew Toloczko Aff. [D.E. 88-1], June 10, 2014; Broom Aff. [D.E. 88-2] ¶¶ 16–18.[4]

## II.

Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). The moving party bears the burden of initially coming forward and demonstrating the absence of a genuine issue of material fact.

---

[4] On July 3 and 4, 2014, Hurricane Arthur struck the Outer Banks. The Court has no information concerning Hurricane Arthur's effect on the Town or the Cottage.

See Celotex Corp., 477 U.S. at 325. Once the moving party has met its burden, summary judgment is appropriate unless the nonmoving party can affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 587. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Nor will a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . be []sufficient; there must be evidence on which the jury could reasonably find for [the nonmoving party]." Anderson, 477 U.S. at 252.

In evaluating affidavits submitted in support of or in opposition to a motion for summary judgment, the court may reject inadmissible evidence (such as hearsay) described in such affidavits. See Fed. R. Civ. P. 56(c); Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996). Likewise, a party opposing summary judgment may not disclaim admissions made under Rule 36 of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 36(b); New Amsterdam Cas. Co. v. Waller, 323 F.2d 20, 24 (4th Cir. 1963). "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

A.

In its supplemental briefing, the Town clarified that it has withdrawn its claims for an order of abatement, and seeks only to recover the civil penalties it assessed against the Toloczkos for their failure to obey the Town's order to demolish the Cottage. See Town's Supp. Mem. [D.E. 73] 2–5.

12

Although the Town has not specified the amount of civil penalties it seeks, the record suggests that the Town assessed $100 civil penalties against the Toloczkos each day from January 27, 2010 through September 14, 2011, the day the Town lifted the Nuisance Declaration, or until December 2013, when the Toloczkos began repairing the Cottage. See Am. Compl., Ex. B; [D.E. 39-3] ¶ 32; compare Oral Arg. Tr. 4, 7–8, with id. 53.

The Town's claim for civil penalties fails. The Town's purported sources of authority for ordering the Toloczkos to demolish the Cottage were subsections (b) and (c) of the Nuisance Ordinance. See [D.E. 7-1]; Town Code § 16-31(6)(b), (c). Neither subsection can sustain the Town's order. As for subsection (c), under North Carolina law, only the State, acting through the Attorney General, has the authority to enforce public trust rights. See Cherry, 723 S.E.2d at 160–61.[5] Thus, the Town did not have the authority to declare the Cottage a public nuisance solely because of its location in what the Town considers to be a public trust area.

Subsection (b), unlike subsection (c), falls within the scope of the police powers the State of North Carolina has delegated to the Town. See N.C. Gen. Stat. §§ 160A-174, 160A-193. The Town's police powers do not, however, include the power to order the destruction of a structure without first giving the owner a reasonable opportunity to repair it, unless the structure poses "an imminent threat to the public." Monroe v. City of New Bern, 158 N.C. App. 275, 278–80, 580 S.E.2d 372, 374–75 (2003); see Horton v. Gulledge, 277 N.C. 353, 363, 177 S.E.2d 885, 892 (1970) ("To require [a structure's] destruction, without giving [its] owner a reasonable opportunity to remove the existing threat to the public health, safety, and welfare, is arbitrary and unreasonable."), overruled on other grounds, State v. Jones, 305 N.C. 520, 290 S.E.2d 675 (1982); cf. Hillsboro

_____

[5] Until the Supreme Court of North Carolina says otherwise, the North Carolina Court of Appeals decision in Cherry articulates North Carolina law. See Toloczko, 728 F.3d at 397–98.

13

Partners, LLC v. City of Fayetteville, 738 S.E.2d 819, 827 (N.C. Ct. App. 2013) (upholding a local government's destruction of a nuisance property where the owner had been provided an opportunity to repair the property and had failed to do so); Cherry, 723 S.E.2d at 164. The record conclusively shows that, when the Nuisance Declaration was in effect, the Town did not provide the Toloczkos a reasonable opportunity to repair the Cottage, and the Cottage did not pose an imminent threat to the public. Thus, the Town lacked authority to order the Toloczkos to destroy the Cottage. The Town cannot recover civil penalties for the Toloczkos' refusal to obey an order it lacked authority to enter. Accordingly, the court grants summary judgment to the Toloczkos on the Town's claim for civil penalties.

B.

Next, the court addresses the Toloczkos' counterclaims. In their first counterclaim, the Toloczkos originally sought a declaration that, among other things, "the Cottage is not located within the [p]ublic [t]rust." Countercl. ¶¶ 106-14. The Toloczkos have since clarified that they are not asking the court to determine the extent of the public trust doctrine, but are asking only for a determination that the Cottage is not located on the wet-sand portion of the beach, which the State of North Carolina owns. See Toloczkos' Supp. Reply Mem. [D.E. 74] 6-7. A survey conducted on February 8, 2011, shows that no part of the Cottage was located on the wet-sand beach. See Styons Aff. [D.E. 26-3] ¶ 5 & Ex. A. Morever, on October 10, 2011, the Town admitted that, as of that date, "the Cottage [was] located entirely landward of the Mean High Water Mark," and stated that "[t]he [C]ottage would appear to be on the dry sand beach at present." See [D.E. 39-3] 3, 12. Accordingly, the court grants summary judgment to the Toloczkos on their first counterclaim and declares that the Cottage is not located on the wet-sand beach.

In their second counterclaim, the Toloczkos seek a declaratory judgment that, by enacting

14

subsection (c) of the Nuisance Ordinance, the Town exceeded the authority delegated to it by the North Carolina General Assembly. Countercl. ¶¶ 115–22; see Town Code § 16-31(6)(c). The Town concedes that, in light of Cherry, the Toloczkos are entitled to summary judgment on this counterclaim. See Town's Supp. Mem. 13–14; Cherry, 723 S.E.2d at 160–61 (holding that only the State, acting through the Attorney General, has the authority to enforce public trust rights); see also Toloczko, 728 F.3d at 397–98. Accordingly, the court grants summary judgment to the Toloczkos on their second counterclaim and declares that the Town lacked authority from the North Carolina General Assembly to enact subsection (c) of the Nuisance Ordinance.

In their third counterclaim, the Toloczkos seek a declaration that, by ordering them to demolish the Cottage without first holding a hearing, the Town violated N.C. Gen. Stat. §§ 160A-441 to 160A-450. See Countercl. ¶¶ 123–30. Now that the Town has withdrawn the Nuisance Declaration, the Town no longer demands that the Toloczkos demolish the Cottage. See [D.E. 39-1]. Thus, this counterclaim is moot. See, e.g., Alvarez v. Smith, 558 U.S. 87, 93–94 (2009); Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 108–09 (1998); Spencer v. Kemna, 523 U.S. 1, 17 (1998); Renne v. Geary, 501 U.S. 312, 320–21 (1991); O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974); Brooks v. Vassar, 462 F.3d 341, 348 (4th Cir. 2006); Reyes v. City of Lynchburg, 300 F.3d 449, 453 (4th Cir. 2002); Am. Legion Post 7 v. City of Durham, 239 F.3d 601, 606 (4th Cir. 2001); Jones v. Poindexter, 903 F.2d 1006, 1009 (4th Cir. 1990). To the extent that, in this counterclaim, the Toloczkos also seek a declaration that the Town cannot collect civil penalties from the Toloczkos due to their failure to comply with the Town's request for an order of abatement, the court already has so held in awarding summary judgment to the Toloczkos on the Town's sole remaining claim.

In their fourth counterclaim, the Toloczkos seek a declaration that the Cottage is not likely to cause personal or property injury, or in other words, that it is not a nuisance under subsection (b)

15

of the Nuisance Ordinance. The Town claims that there remains a genuine issue of material fact concerning whether the Cottage is likely to cause personal or property injury. In support, the Town cites the town manager's affidavit dated July 19, 2011, which was before the Town renourished the beaches. See Ogburn Aff. [D.E. 30-2], July 19, 2011. Since the August 2011 renourishment, however, the Town has admitted multiple times that the Cottage is not a danger to the public. See [D.E. 39-3] ¶ 9 (admitting, pursuant to Rule 36 of the Federal Rules of Civil Procedure, that "the current condition of the Cottage poses no imminent threat to the public's safety"); id. ¶ 30 (denying that the Cottage is a nuisance pursuant to subsection (b) of the Nuisance Ordinance after renourishment); see also [D.E. 39-1] (withdrawing the Nuisance Declaration upon a determination "that the Cottage . . . no longer constitutes a violation of Town Code Sec. 16-31(6)(b)"); Ogburn Dep. 75, Sept. 14, 2011 (agreeing with the statement that the Cottage "in its present condition does not pose a threat to the public safety and welfare, nor does it appear to be in danger of imminent collapse"). Moreover, as of December 5, 2013, the Toloczkos began repairing the Cottage, and anticipate that repairs will be complete in September or October 2014. See Matthew Toloczko Aff., June 10, 2014; Broom Aff. ¶¶ 16–18. The Town's post-renourishment admissions trump the town manager's pre-renourishment affidavit. See Fed. R. Civ. P. 36(b) ("A matter admitted under this rule is conclusively established . . . ."); see also Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975–76 (4th Cir. 1990) (affirming the district court's decision to ignore an affidavit that contradicted the affiant's prior deposition testimony). Accordingly, the court grants summary judgment to the Toloczkos on their fourth counterclaim and declares that the Cottage is not likely to cause personal or property injury.

In their fifth counterclaim, the Toloczkos seek a declaration that the Town lacks the authority to declare a structure to be a public nuisance solely because it is located on the dry-sand beach. See

16

Countercl. ¶¶ 138–53. This counterclaim arises from the Town's position that the dry-sand beach is part of the "public trust area," and that structures "located in whole or in part" on the dry-sand beach are nuisances under subsection (c) of the Nuisance Ordinance. The Town concedes that, in light of Cherry, the Toloczkos are entitled to summary judgment on this counterclaim. See Town's Supp. Mem. 15–16; Cherry, 723 S.E.2d at 160–61 (holding that only the State, acting through the Attorney General, has the authority to enforce public trust rights); see also Toloczko, 728 F.3d at 397–98. Accordingly, the court grants summary judgment to the Toloczkos on their fifth counterclaim and declares that the Town has no authority to declare a structure to be a public nuisance solely because it is located on the dry-sand beach.

In their sixth counterclaim, the Toloczkos seek a declaration that the term "public trust area" in subsection (c) of the Nuisance Ordinance includes only the wet-sand beach, and not the dry-sand beach. In light of the court's conclusion that the Town had no authority to enact subsection (c) of the Nuisance Ordinance, the court need not interpret subsection (c). Cf. Cherry, 723 S.E.2d at 160–61. Thus, the court dismisses the Toloczkos' sixth counterclaim as moot.

The Toloczkos have withdrawn their seventh, eighth, ninth, tenth, eleventh, twelfth, thirteenth, fourteenth, and fifteenth counterclaims. See Toloczkos' Supp. Mem. [D.E. 72] 17–18; Oral Arg. Tr. 16. Thus, the court need not address them.

In their sixteenth counterclaim, the Toloczkos allege that the Town, acting under color of state law, has deprived them of their right not to have their property taken for public use by the government without just compensation, in violation of 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution. See Countercl. ¶¶ 269–73; Toloczkos' Supp. Mem. 18. The Toloczkos' sixteenth counterclaim is addressed below in conjunction with their other takings-related claims.

17

In their seventeenth counterclaim, the Toloczkos ask the court to enjoin the Town from demolishing the Cottage, assessing or enforcing civil penalties against the Toloczkos, or taking "any other adverse action" against the Toloczkos concerning the Cottage. See Countercl. ¶¶ 274–82. The court need not enjoin the Town from destroying the Cottage because the Town no longer seeks to destroy the Cottage, and the Toloczkos have not offered evidence that the Town is likely to do so in the future. See, e.g., Alvarez, 558 U.S. at 93–94; Steel Co., 523 U.S. at 108–09; Spencer, 523 U.S. at 17; Renne, 501 U.S. at 320–21; City of Los Angeles v. Lyons, 461 U.S. 95, 105–13 (1983); O'Shea, 414 U.S. at 495–96. The court also need not enjoin the Town from assessing or enforcing civil penalties against the Toloczkos in light of the court's decision to grant summary judgment to the Toloczkos on the Town's claim for civil penalties. Finally, the court will not enjoin the Town from taking "any other adverse action" against the Toloczkos concerning the Cottage because such adverse action is, at this point, only "conjectural or hypothetical." Lebron v. Rumsfeld, 670 F.3d 540, 560 (4th Cir. 2012); see Winter v. Nat. Resources Def. Council, Inc., 555 U.S. 7, 32–33 (2008).

C.

In their eighteenth counterclaim, the Toloczkos claim that the Town took their property for public use without paying just compensation, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and the Law of the Land Clause of the North Carolina Constitution. See Countercl. ¶¶ 283–92; U.S. Const. amend. V, amend. XIV, § 1; N.C. Const. art. I, § 19.[6] In their nineteenth counterclaim, the Toloczkos claim that the Town condemned their property without filing

_____

[6] The court assumes without deciding that the Toloczkos can bring the federal portion of counterclaim eighteen directly under the Takings Clause. See First English Evangelical Lutheran Church v. Cnty. of Los Angeles, 482 U.S. 304, 316 n.9 (1987); Lawyer v. Hilton Head Pub. Serv. Dist. No. 1, 220 F.3d 298, 302 n.4 (4th Cir. 2000); cf. City of Monterey v. Del Monte Dunes at Monterey, Ltd., 526 U.S. 687, 709–22 (1999) (analyzing a takings claim brought under 42 U.S.C. § 1983 and the Takings Clause).

18

formal condemnation proceedings (i.e., inverse condemnation). See Countercl. ¶¶ 293–306; N.C. Gen. Stat. § 40A-51; Long v. City of Charlotte, 306 N.C. 187, 199–202, 293 S.E.2d 101, 109–11 (1982). The Toloczkos' sixteenth, eighteenth, and nineteenth counterclaims are materially indistinguishable. All depend on whether the Town's actions constituted a taking under the Fifth Amendment. Accordingly, the court analyzes counterclaims sixteen, eighteen, and nineteen together.[7]

In Toloczko, the Fourth Circuit held that the Toloczkos need not first seek and be denied compensation in state-court proceedings before proceeding with their takings claim in this court. See Toloczko, 728 F.3d at 399; cf. Palazzolo v. Rhode Island, 533 U.S. 606, 618–21 (2001) (noting general rule that a takings claim challenging government regulatory conduct directed at property is not ripe for judicial review unless the government entity charged with implementing the regulatory conduct has reached a final decision regarding the application of the regulation to the property at issue); First English Evangelical Lutheran Church, 482 U.S. at 312 n.6 (same); MacDonald, Sommer & Frates v. Yolo Cnty., 477 U.S. 340, 351 (1986) (same); Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 195 (1985) (same); Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1016, 1019–20 (1984) (same). Thus, the court addresses the Toloczkos' takings claim

---

[7] Counterclaim eighteen, unlike counterclaims sixteen and nineteen, relies on the Law of the Land Clause of the North Carolina Constitution in addition to the Fifth Amendment Takings Clause. See Countercl. ¶ 284. Although the North Carolina Constitution does not expressly prohibit governments from taking private property for public use without just compensation, the Supreme Court of North Carolina has found such a prohibition in the Law of the Land Clause. See, e.g., Finch v. City of Durham, 325 N.C. 352, 362–63, 384 S.E.2d 8, 14 (1989). The Supreme Court of North Carolina uses the same standard for determining whether a government took property in violation of the North Carolina Constitution as the Supreme Court of the United States uses to assess a Fifth Amendment takings claim. See, e.g., Finch, 325 N.C. at 371–72, 384 S.E.2d at 19; N.C. Dep't of Transp. v. Cromartie, 716 S.E.2d 361, 367 (N.C. Ct. App. 2011); Adams Outdoor Adver. of Charlotte v. N.C. Dep't of Transp., 112 N.C. App. 120, 122, 434 S.E.2d 666, 667 (1993).

under both the United States Constitution and the North Carolina Constitution.

The Fifth Amendment Takings Clause applies to the States through the Fourteenth Amendment. See, e.g., Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 536 (2005). It provides that private property shall not "be taken for public use, without just compensation." U.S. Const., amend. V. This prohibition "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960). It applies to temporary government actions as well as permanent ones. See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322–23 (2002); First English Evangelical Lutheran Church, 482 U.S. at 318–19; Henry v. Jefferson Cnty. Comm'n, 637 F.3d 269, 276 (4th Cir. 2011).

"The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property." Lingle, 544 U.S. at 537. For example, when the government uses its eminent domain power to condemn a person's land for some public purpose (such as to build a road or a military base), the government has "taken" that land and must pay just compensation for it. See, e.g., Ark. Game & Fish Comm'n v. United States, 133 S. Ct. 511, 518 (2012); Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot., 560 U.S. 702, 713–15 (2010); Lingle, 544 U.S. at 537; Tahoe-Sierra, 535 U.S. at 321–22.

A taking also occurs, however, when instead of appropriating or invading private property, the government undertakes "regulatory actions that are functionally equivalent to the classic taking." Lingle, 544 U.S. at 539. "No magic formula enables a court to judge, in every case, whether a given government interference with property is a taking." Ark. Game & Fish Comm'n, 133 S. Ct. at 518; see Stop the Beach Renourishment, Inc., 560 U.S. at 713. Nonetheless, the Court has identified two situations in which a regulation will, per se, constitute a taking. First, a regulation is a taking if it

20

authorizes a "permanent physical occupation" of property. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982); see, e.g., Ark. Game & Fish Comm'n, 133 S. Ct. at 518. Second, a regulation is a taking if it requires a property owner to sacrifice all economically beneficial use of the property, unless the regulation does no more than enforce limits that "inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1019, 1029 (1992).[8]

Regulations that fit neither per se rule are evaluated using the multi-factor balancing test in Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 124 (1978). See Ark. Game & Fish Comm'n, 133 S. Ct. at 518; Lingle, 544 U.S. at 538–39. The so-called "Penn Central factors" include (1) the regulation's economic impact on the claimant, (2) the extent to which the regulation interferes with the claimant's reasonable, investment-backed expectations, and (3) the character of the government's action. See Lingle, 544 U.S. at 538–39; Penn Cent., 438 U.S. at 124. A regulatory taking (just like a "classic taking") can be either permanent or temporary. See Tahoe-Sierra, 535 U.S. at 322–23; Lucas, 505 U.S. at 1030 n.17; First English Evangelical Lutheran Church, 482 U.S. at 318–19.

The Toloczkos claim that the Town's regulatory actions effected a taking of their property in two ways. First, the Toloczkos claim that, by stating in the Nuisance Declaration that the Cottage was located in a public trust area, the Town effected a physical-occupation taking of their property under Loretto and its progeny. See Toloczkos' Supp. Mem. 22–23. The Toloczkos claim that this taking occurred from the date of the Nuisance Declaration at least until the date the North Carolina

---

[8] This principle also applies under the North Carolina Constitution. See, e.g., Helms v. City of Charlotte, 255 N.C. 647, 655–57, 122 S.E.2d 817, 824–25 (1961).

Court of Appeals decided <u>Cherry</u> (i.e., February 21, 2012). Second, the Toloczkos claim that, when the Nuisance Declaration was in effect, and until November 15, 2013, the Town's refusal to issue permits deprived them of the ability to use or rent the Cottage—a deprivation which the Toloczkos claim effected a temporary regulatory taking under <u>Penn Central</u>. <u>See id.</u> 28–33. The court addresses each claim in turn.

As for the Toloczkos' first takings theory, when a regulatory action authorizes "a permanent physical occupation of property," the action effects "a taking to the extent of the occupation, without regard to whether the action achieves an important public benefit or has only a minimal impact on the owner." <u>Loretto</u>, 458 U.S. at 434–35. For example, in <u>Loretto</u>, the Court held that the government had committed a taking when it enacted a statute authorizing a cable television company to install cable lines on private property without the property owner's consent. <u>See id.</u> at 423–26. In finding a taking, the Court emphasized that "an owner suffers a special kind of injury when a <u>stranger</u> directly invades and occupies the owner's property." <u>Id.</u> at 436. Moreover, the cable company's "direct physical attachment of plates, boxes, wires, bolts, and screws to the building, completely occupying space immediately above and upon the roof and along the building's exterior wall" permanently appropriated the owner's property. <u>Id.</u> at 436–38; <u>see</u> <u>Stop the Beach Renourishment, Inc.</u>, 560 U.S. at 713. Similarly, in <u>Kaiser Aetna v. United States</u>, 444 U.S. 164, 179–80 (1979), the Court held that the Army Corps of Engineers had committed a taking when it imposed a federal navigational servitude on a private pond in Hawaii. In <u>Kaiser Aetna</u>, the landowner made extensive improvements to a private pond, including connecting the pond to the navigable waters of the United States. <u>Id.</u> at 167–68. Nonetheless, the landowner took the position that the pond remained private property and that the landowner could deny public access to the pond. <u>Id.</u> at 168–69. The Army Corps of Engineers disagreed and imposed a federal navigational servitude.

22

In doing so, the Corps told the landowner that the landowner was precluded from denying public access to the pond that, as a result of improvements by the landowner, had become a navigable water of the United States. Id. at 169, 176–77. In finding a taking, the Court emphasized several factors. First, before the improvements to the pond, the pond was not capable of being used for navigation in interstate commerce. Id. at 178. Second, the pond always had been considered private property under Hawaii law. Id. at 179. Third, the navigational servitude "w[ould] result in an actual physical invasion of the privately owned marina" and thereby deprive the owner of the owner's right to exclude. Id. at 179–80; see also, e.g., Love Terminal Partners v. United States, 97 Fed. Cl. 355, 412–25 (2011) (finding that Congress effected a taking when it mandated the demolition of gates at the claimant's airport).

In Nollan v. Cal. Coastal Comm'n, 483 U.S. 825 (1987), the United States Supreme Court applied the Loretto "permanent physical occupation" rule in the context of public beach access. In Nollan, the Nollans applied for a permit from the California Coastal Commission to demolish their dilapidated oceanfront cottage and replace it with a new, larger cottage. The Commission granted the permit, but only on the condition that the Nollans grant, in return, a public easement across the beach portion of their property. In analyzing the takings claim, the Court explained that if the Commission had "simply required the Nollans to make an easement across their beachfront available to the public on a permanent basis in order to increase public access across the beach, rather than conditioning their permit to rebuild their house on their agreeing to do so, [there is] no doubt that there would have been a taking." Id. at 831. A "permanent physical occupation" occurs, the Court held, when "individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." Id. at 832.

23

The Toloczkos claim that the Town gave the beachgoing public in Nags Head just such a right through its repeated assertions that the portion of the Toloczkos' property located on the dry-sand beach is within the public trust. See, e.g., [D.E. 7-1] (asserting, in the Nuisance Declaration, that the Cottage is located "within the public trust"); [D.E. 39-1] (stating, in the letter withdrawing the Nuisance Declaration, that "[t]his decision is not because the Cottage is no longer located on the public trust area or public land because [it] clearly still [is]"); Ogburn Dep. 16, Sept. 14, 2011 (stating that "the public has a right to use" the portion of the Toloczkos' property located on the dry-sand beach); 2013 LUP Amends. 6. Indeed, the Town admitted at oral argument that, before the North Carolina Court of Appeals decided Cherry, the Town would not have allowed the Toloczkos to build a fence around the portion of their property located on the dry-sand beach. See Oral Arg. Tr. 62.

The court rejects the Toloczkos' physical-occupation takings claim. In Nollan, Loretto, and Kaiser Aetna, it was clear that before the government acted, the property owner had the exclusive right to use the property at issue, and that the government action at issue had (or would have) the legal effect of depriving the property owner of that right to exclusive use. See Nollan, 483 U.S. at 827–29; Loretto, 458 U.S. at 421–24; Kaiser Aetna, 444 U.S. at 166–68, 174. Here, in contrast, the Town stated its understanding of a long-existing relationship between the public's access rights to the dry-sand beach and the Toloczkos' private property rights, and filed suit in an effort to determine whether its understanding was correct. Cf. Kalo, supra, at 1892–97 (describing North Carolina law, distinguishing between ownership of the dry-sand beach and the public's right to access the dry-sand beach, and noting the lack of clarity under North Carolina law concerning whether the public has a limited right of access to the dry-sand beach). The Town did not, however, authorize the public to invade the Toloczkos' property, erect signs inviting the public onto the Toloczkos' property, or take

24

any other action to license or require a physical invasion of the Toloczkos' property. Moreover, this court has not located a single case from the Supreme Court of the United States, the Fourth Circuit, or any other court finding a physical-occupation taking based solely on the initiation of nuisance litigation without some government action licensing or requiring an actual physical invasion of the private property. Compare Loretto, 458 U.S. at 427–38, 441, and Kaiser Aetna, 444 U.S. at 178–81, and Love Terminal Partners, 97 Fed. Cl. at 412–25, with Yee v. City of Escondido, 503 U.S. 519, 529–32 (1992) (finding no physical-occupation taking when the government enacted a regulation preventing mobile-home-park owners from setting certain rents and placing limits on who tenants could be, but leaving to owners the right to evict tenants and to determine whether to use their land as a mobile home park at all), and FCC v. Fla. Power Corp., 480 U.S. 245, 250–54 (1987) (finding no physical-occupation taking when the government regulated the rates that power companies could charge cable companies for pole attachments but did not require that the power companies allow attachments or agree to physical occupations of their property), and Southview Assocs., Ltd. v. Bongartz, 980 F.2d 84, 92–95 (2d Cir. 1992) (finding no physical-occupation taking when the government denied a land-use permit under a state land-use statute that prohibited the owner from developing 33 lots in a deeryard habitat), and Esposito v. S.C. Coastal Council, 939 F.2d 165, 170 (4th Cir. 1991) (finding no physical-occupation taking when the government prohibited any new construction on property owners' oceanfront lots); see also PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 82–84 (1980) (finding no physical-occupation taking where the government forced a shopping-center owner who made his shopping center open to the public to allow reasonable speech and petitioning activities on the owner's property). Simply put, in expressing its opinion about the scope of the public trust, the Town did not require the Toloczkos to suffer a physical occupation of their property or license others to invade the Toloczkos' property. Cf. Yee, 503 U.S. at 532 ("Had

25

the city['s regulation] required such an occupation, of course, petitioners would have a right to compensation . . . ."); Fla. Power Corp., 480 U.S. at 252–53 ("The line which separates [this case] from Loretto is the unambiguous distinction between a . . . lessee and an interloper with a government license."); Loretto, 458 U.S. at 440 ("So long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor [Penn Central] inquiry generally applicable to nonpossessory government activity." (emphasis added)). Moreover, no record evidence shows that any member of the public relied on the Town's opinion about the scope of the public trust in deciding whether to cross the portion of the Toloczkos' land located on the dry-sand beach. Thus, on this record, the Town's opinion about the scope of the public trust did not effect a physical occupation of the Toloczkos' property.

The Toloczkos' second takings theory is that the Town deprived them of the ability to use or rent the Cottage from November 30, 2009, when the Nuisance Declaration took effect, through November 15, 2013, when the Toloczkos received permits to repair the Cottage. The Toloczkos contend that this deprivation effected a taking under Penn Central. The Town responds that its actions "were reasonable—if mistaken—uses of its police power," and that its actions did not deprive the Toloczkos of "any constitutionally cognizable property right." Town's Supp. Mem. 21.

The court rejects the Town's argument that it is insulated from takings liability because it was attempting, in good faith, to act pursuant to its police power. In Lingle, the Supreme Court clarified that whether a government action is valid is conceptually distinct from whether that action works a compensable taking. See Lingle, 544 U.S. at 543 ("[T]he Takings Clause presupposes that the government has acted in pursuit of a valid public purpose."). Thus, even if the Town lawfully could have ordered the Toloczkos to demolish the Cottage pursuant to its police powers, that authority

26

would not preclude a takings claim. See, e.g., Lucas, 505 U.S. at 1025–26; Acadia Tech., Inc. v. United States, 458 F.3d 1327, 1332 (Fed. Cir. 2006) (noting that "it is insufficient to avoid the burdens imposed by the Takings Clause simply to invoke the 'police powers' of the state"). Likewise, the Town's assertion that it acted in good faith is irrelevant to the takings analysis, because the Constitution "measures a taking of property not by what the State says, or by what it intends, but by what it does." Hughes v. Washington, 389 U.S. 290, 298 (1967) (Stewart, J., concurring); see Davis v. George B. Newton Coal Co., 267 U.S. 292, 301 (1925); Long, 306 N.C. at 203, 293 S.E.2d at 111–12.

The court also rejects the Town's argument that Sansotta v. Town of Nags Head, 724 F.3d 533, 541–42 (4th Cir. 2013), compels the conclusion that the Town did not deprive the Toloczkos of any property right. The Town emphasizes that the Fourth Circuit in Sansotta rejected a procedural due process claim made against the Town by property owners similarly situated to the Toloczkos on the ground that the Town's actions had not deprived those property owners of a constitutionally cognizable property right. See id. at 541–42 (holding that the plaintiffs had a constitutionally protected property interest in the money that would be used to pay a fine and in "the right to use and enjoy the cottages as part of their fee simple ownership," but that they failed to prove that the Town had deprived them of these property interests under the Due Process Clause). In Sansotta, however, the Fourth Circuit did not address whether the Sansotta plaintiffs had a property interest in their lost rental income, in their right to exclude, or in their right to be paid for an easement. See id. More fundamentally, Lingle clarified that due process inquiries and takings inquiries are not the same, and in Sansotta, the Fourth Circuit expressly declined to comment on the merits of the takings claim. Id. at 549 n.23; see Lingle, 544 U.S. at 540–43. Thus, Sansotta does not control this court's analysis of the Toloczkos' takings claim.

27

Next, the Town correctly notes that the Toloczkos have no right to use their property in a manner inconsistent with the State's background principles of nuisance law. Town's Supp. Mem. 21–23; see Lucas, 505 U.S. at 1029–30. But even assuming that the Cottage constituted a nuisance in its storm-damaged state, no record evidence suggests that the Cottage would have continued to be a nuisance had the Town allowed the Toloczkos to repair it, as North Carolina law obligated the Town to do. See Horton, 277 N.C. at 363, 177 S.E.2d at 892; cf. Cherry, 723 S.E.2d at 164. Instead, the evidence shows that the Toloczkos would have done what they did after prior storms and what they eventually did when the Town lifted the Nuisance Declaration and issued the permits: repaired the Cottage and used it like thousands of other North Carolinians with homes on the dry-sand beach, as a place to live themselves and to rent to others. Cf. Lucas, 505 U.S. at 1031 ("The fact that a particular use has long been engaged in by similarly situated owners ordinarily imports a lack of common-law prohibition . . . ."). No rational jury could find that such use constitutes a nuisance under the background principles of North Carolina common law. See, e.g., State v. Everhardt, 203 N.C. 610, 617–18, 166 S.E.2d 738, 741–42 (1932) ("Whatever tends to endanger life, or generate disease, and affects the health of the community; whatever shocks the public morals and sense of decency . . . is generally, at common law, a public nuisance, and a crime.").[9]

---

[9] The Town did not raise, and therefore the court does not address, whether the Toloczkos' takings claim could be defeated on the theory that the public trust doctrine is a background principle of North Carolina property law, and independently limited how the Toloczkos could use the Cottage even though the Town lacked authority under North Carolina law to enforce public trust rights. Cf., e.g., Esplanade Props., LLC v. City of Seattle, 307 F.3d 978, 985–87 (9th Cir. 2002); Nat'l Ass'n of Home Builders v. N.J. Dep't of Envtl. Prot., 64 F. Supp. 2d 354, 358 (D.N.J. 1999); McQueen v. S.C. Coastal Council, 354 S.C. 142, 146–51, 580 S.E.2d 116, 118–20 (2003). Likewise, the Town did not raise the doctrine of custom as a background principle of North Carolina property law. Cf. Kalo, supra, at 1894.

Next, the court analyzes the Penn Central factors to determine whether a genuine issue of material fact exists concerning whether the deprivation was sufficiently serious to constitute a taking. Under Penn Central, the court must first consider the economic impact of the Town's actions on the Toloczkos' property. Because the Town refused to allow the Toloczkos to repair the Cottage, the Toloczkos could not use or rent it. As a consequence, the Toloczkos estimate that they lost about $140,000 in rental income. See Toloczkos' Supp. Mem. 30; Matthew Toloczko Aff. ¶ 5, June 9, 2011. Morever, after the Nuisance Declaration, the Toloczkos' property went from being valued at $175,000 to being deemed a washout with a value of $0—a total loss of value. See [D.E. 72-24]; Skeen Aff. 2. Thus, this factor appears to weigh heavily in favor of the Toloczkos.

Next, the court must consider the extent to which the Town's refusal to issue permits to repair the Cottage interfered with the Toloczkos' reasonable, investment-backed expectations about the use of their property. The court looks "to the existing use of property as a basis for determining the extent of interference with the owner's 'primary expectation concerning use of the parcel.'" Esposito, 939 F.2d at 170 (quoting Penn Cent., 438 U.S. at 136); see also Nat'l Adver. Co. v. City of Raleigh, 947 F.2d 1158, 1162 (4th Cir. 1991). For example, in Penn Central, the court found no taking in part because the regulation at issue allowed the existing use of the claimant's property to continue. See Penn Cent., 438 U.S. at 136. Here, in contrast, the Town reversed its past practice of allowing the Toloczkos to rebuild and repair the Cottage after storm damage, preventing the Toloczkos from using the Cottage the way they always had, as a residence and rental property. To be sure, the Toloczkos have been on notice that the beach in front of the Cottage is eroding, and may eventually erode to the point that the Cottage can no longer legally or practically be repaired. Nonetheless, the Toloczkos rightly expected that the Town would not attempt to accelerate that process through its unauthorized assertion of the public trust doctrine. Thus, this factor also appears

29

to weigh in favor of the Toloczkos.

Finally, the court must consider the character of the Town's actions, "for instance whether [they] amount[ed] to a physical invasion or instead merely affect[ed] property interests through some public program adjusting the benefits and burdens of economic life to promote the common good." Lingle, 544 U.S. at 539 (quotation omitted). One hallmark of a regulation that does not effect a taking is that it secures an "average reciprocity of advantage" for those affected. See, e.g., Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 488 (1987); Pa. Coal Co. v. Mahon, 260 U.S. 393, 415 (1922). For example, a zoning regulation may prevent a property owner from building a high-rise apartment in a suburban neighborhood, but the value of that owner's property is protected because his neighbors cannot build a high-rise apartment either.

Here, there appears to be no reciprocity of advantage. The Toloczkos and other similarly situated property owners bore the entire burden of the Town's efforts to free the dry-sand beaches of residential structures, but received none of the benefit. Had the Town succeeded in having the Cottage demolished, the result would not have been a mere adjustment of the benefits and burdens of economic life. Rather, the result would have been an outright transfer of wealth from the Toloczkos to the beachgoing public and to those who own the would-be oceanfront cottages behind the Toloczkos' Cottage. Such a transfer of wealth has the character of a taking. Thus, this factor also appears to weigh in favor of the Toloczkos.

In its defense, the Town takes a different view of the evidence concerning the three Penn Central factors. Cf. Naegele Outdoor Adver., Inc. v. City of Durham, 844 F.2d 172, 176–77 (4th Cir. 1988) (explaining that "[r]esolution of the dispute by plenary hearing rather than by summary judgment is particularly important in cases involving claims of regulatory taking," in light of the ad hoc factual inquiries inherent in the Penn Central factors). The Town also asserts that the Toloczkos'

30

inability to repair the Cottage while under the Nuisance Declaration and thereafter was, in effect, the result of factors other than the Town's actions. Essentially, the Town argues that genuine issues of material fact exist concerning the three Penn Central factors and whether the Town's actions proximately caused the Toloczkos' alleged harm. The Supreme Court of North Carolina has defined proximate cause as follows:

> [A] cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed.

Adams v. Mills, 312 N.C. 181, 192–93, 322 S.E.2d 164, 172 (1984) (quotation omitted). "Proximate cause is ordinarily a question of fact for the jury, to be solved by the exercise of good common sense in the consideration of the evidence of each particular case." Williams v. Carolina Power & Light Co., 296 N.C. 400, 403, 250 S.E.2d 255, 258 (1979) (quotation and alteration omitted).

Genuine issues of material fact exist concerning the three Penn Central factors and proximate cause. Cf. Naegele Outdoor Adver., Inc., 844 F.2d at 176–77. A jury will have to determine whether the Town committed a temporary regulatory taking of the Toloczkos' Cottage. The period in dispute began on November 30, 2009, when the Town issued the Nuisance Declaration, continued on September 14, 2011, when the Town rescinded the Nuisance Declaration, and according to the Toloczkos, continued through the two years it took them to actually obtain all the permits they needed to repair the Cottage once the Town lifted the Nuisance Declaration. Cf. First English Evangelical Lutheran Church, 482 U.S. at 321 (distinguishing "normal delays in obtaining building permits" from the sort of government action that supports a temporary taking).

In sum, the court grants summary judgment to the Town on the portion of counterclaims sixteen, eighteen, and nineteen concerning the Toloczkos' physical-occupation takings claim. The

31

court denies summary judgment to the Town and to the Toloczkos on the portion of counterclaims sixteen, eighteen, and nineteen concerning the Toloczkos' temporary regulatory takings claim.

D.

In counterclaim twenty, the Toloczkos seek damages and allege that the Town slandered their title by repeatedly stating that the Cottage is in the public trust area. See Countercl. ¶¶ 307–15. Under North Carolina law, "[t]he elements of slander of title are (1) the uttering of slanderous words in regard to the title of someone's property, (2) the falsity of the words, (3) malice, and (4) special damages." Mecimore v. Cothren, 109 N.C. App. 650, 655, 428 S.E.2d 470, 473 (1993).

No rational jury could reasonably find that the Town acted with malice when it made statements about the public trust. See, e.g., Cardon v. McConnell, 120 N.C. 461, 461, 27 S.E. 109, 109 (1897) (holding that if the defendant's false assertion was made in good faith, a slander-of-title claim fails). Thus, the court grants summary judgment to the Town on counterclaim twenty.

In counterclaim twenty-one, the Toloczkos seek damages for negligence and allege that the Town was negligent under North Carolina law in failing to properly inspect the Cottage before declaring that the Cottage violated Ordinance 16-31(6). See Countercl. ¶¶ 316–21. The public duty doctrine, however, defeats this counterclaim. Under the public duty doctrine, a state or municipal government is free to enact laws for public protection without exposing the government to liability for failing to properly enforce such laws, including negligent enforcement. See, e.g., Braswell v. Braswell, 330 N.C. 363, 370–71, 410 S.E.2d 897, 901 (1991); Britt v. City of Wilmington, 236 N.C. 446, 450–51, 73 S.E.2d 289, 293 (1952); Christmas v. Cabarrus Cnty., 192 N.C. App. 227, 232, 664 S.E.2d 649, 652–53 (2008), disc. rev. denied, 363 N.C. 372, 678 S.E.2d 234 (2009). Moreover, the record demonstrates that the two "narrow" exceptions to the public duty doctrine do not apply. Under those two "narrow" exceptions, a government can be liable (1) where there is a special

32

relationship between the governmental entity and the injured party; or (2) where the governmental entity creates a special duty by promising protection to an individual, the protection is not forthcoming, and the individual's reliance on the promise of protection is causally related to the injury suffered. See, e.g., Hunt v. N.C. Dep't of Labor, 348 N.C. 192, 197–99, 499 S.E.2d 747, 750–51 (1998); Scott v. City of Charlotte, 691 S.E.2d 747, 754–55 (N.C. Ct. App. 2010); Lane v. City of Kinston, 142 N.C. App. 622, 626–27, 544 S.E.2d 810, 814 (2001). Accordingly, the court grants summary judgment to the Town on counterclaim twenty-one.

## III.

In sum, on the Town's third claim and the Toloczkos' first, second, fourth, and fifth counterclaims, the court GRANTS the Toloczkos' motion for summary judgment and DENIES the Town's motion for summary judgment. The court GRANTS summary judgment to the Town on the Toloczkos' physical-occupation takings claim in counterclaims sixteen, eighteen, and nineteen, and DENIES summary judgment to the Town and the Toloczkos on the Toloczkos' temporary regulatory takings claim in counterclaims sixteen, eighteen, and nineteen. On the Toloczkos' twentieth and twenty-first counterclaims, the court DENIES the Toloczkos' motion for summary judgment and GRANTS the Town's motion for summary judgment. The court DISMISSES the Toloczkos' third and sixth counterclaims as moot. The court DENIES the motion to strike [D.E. 78]. The trial scheduled for September is canceled. The parties shall consult and submit a proposed schedule for resolving the remaining issues. The proposed schedule is due no later than September 5, 2014. The court will hold the trial beginning on December 4, 2014, in Raleigh. The parties shall advise the court of the anticipated number of trial days, but should not expect that the court will give either side all the days requested. A single jury will resolve the issue of liability and damages.

33

SO ORDERED. This 18 day of August 2014.

JAMES C. DEVER III
Chief United States District Judge